**RICHMAN BROTHERS COMPANY, a corporation, Plaintiff, v. AMALGAMATED CLOTHING WORKERS OF AMERICA, Defendants.**

Common Pleas Court, Cuyahoga County.

No. 641936.   Decided April 14, 1953.

Jones, Day, Cockley & Reavis, Cleveland, for plaintiff.
Moses Krislov, Corrigan, McMahon & Corrigan, Cleveland, for defendants.

## OPINION

By CONNELL, J.

This matter came before the Court on the motion of the

plaintiff for a temporary injunction against various defendants. For expediency, we will herein call plaintiff, The Richman Brothers Company,—the Company; we will call the defendant, Amalgamated Clothing Workers of America, along with various other Amalgamated associations, officers, and members of Amalgamated Unions—the Amalgamated.

This cause has had a procedural history worthy of mention, before discussing the matter before this court. The activities of which the Company here complains against the Amalgamated began in March, of 1951. Plaintiff filed its petition for permanent injunction and equitable relief against Amalgamated on October 18, 1952, along with the within motion for a temporary injunction. Amalgamated had the cause removed to the U. S. District Court shortly thereafter, on the ground that only that Court had jurisdiction. The Federal Court, in an excellent opinion rendered by Judge Charles J. McNamee, remanded the case back to this court on January 7, 1953, on the ground the Federal Court had no jurisdiction. Amalgamated applied for re-hearing in Federal Court and was overruled, a second time by Judge McNamee.

This cause was then set for hearing before the Common Pleas Court herein for March 24, 1953. On January 28, 1953, defendants filed a motion to dismiss in the Court of Common Pleas on the ground that the Court of Common Pleas had no jurisdiction in the matter on the theory that Congress has "pre-empted" the right of any State, or any State court to take jurisdiction of this kind of action, and on March 12, 1953 this court overruled such motion to dismiss, treating it as a demurrer to the petition on the ground that this court did not have jurisdiction of the subject of the action. Defendants then applied to Federal Court on March 23, 1953 in an effort to stay the hearing set in Common Pleas Court for March 24, 1953 on the ground that only the Federal Court had jurisdiction of the action and defendants were again overruled by Judge McNamee. On March 24, 1953 hearing began before us, on the within matter. The above references concerning these procedural matters will explain the seeming delay of this court in finally commencing hearings on March 24, 1953, on a motion of plaintiff for temporary injunction which had been filed five months before, to wit, October 18, 1952.

In accordance with §11890 GC, this matter was submitted. on affidavits by both sides, along with the oral testimony of defendant, Beryl Peppercorn, who is the manager of the Cleveland Joint Board of Amalgamated Clothing Workers of America. Peppercorn testified that he is in general respon-

sible in northeastern Ohio, for the activities of various defendants, with which we are here concerned. Beryl Peppercorn has been prominently identified with the work of the Amalgamated in this area for many years and he testified that over a period of many years he had often gone to the vicinity of the Richman Brothers Plant on East 55th Street, in the city of Cleveland, for the purpose of distributing literature to the employees of the plant as they left same; that over the years he had had no success in attempting to organize the employes of the Company, and he expressed it as his opinion that the company was preventing his success in his endeavor.

He testified that he had some employes of the company in his union but refused to say how many; he stated that he had not informed the company of such fact; he stated that there is no dispute between the company and the union, and that all of the activities in which these defendants have engaged and with which we will be herein concerned are for "advertising purposes" only.

He testified that he had heard that at some Company gathering a Mr. Richman had at some past time said that "Richman would never have a Union." The Court considers such testimony as being hearsay and having no probative value.

Peppersorn testified that some time in the month of March, 1951, he wrote a letter to Mr. Richman, president of the Company, suggesting that they have a conference. Prior to that he said he had never met the management at any time in his life; that this was his very first effort at a conference with them. One or two days later he received a letter from Mr. Richman's secretary advising him that Mr. Richman was then out of town, and that after his return, in a matter of three or four days, Richman would contact him. Immediately, and with no further legal justification than is here outlined, and before the three or four days mentioned had elapsed, the Amalgamated put picket lines, not on the Richman plant on 55th Street where some 1400 employees whose unionization was desired by the Amalgamated performed their task of making clothes, but on approximately seventy stores throughout the entire length and breadth of the United States, at which the company sold its merchandize, which seventy stores, including three in the city of Cleveland have been bannered and picketed continuously for a period of over two years ever since, on only that provocation herein mentioned.

Thus it is apparent that the activities of the Amalgamated as hereinafter described, and which have continued for over two years and up to date, are without any legal justification

whatever, unless they can be said to come under its privilege of free speech or advertising, as it claims.

It is perfectly apparent that when Peppercorn, after having waited two decades to win employees, and having utterly failed of their unionization, then wrote the company for the first time, but refused to wait two days for Richman's return to Cleveland to confer with him, he was trying altogether too hard to create that provocation which in his judgment would justify the economic war which he had so well prepared in advance, and which he immediately set into action.

In addition to picketing such seventy stores for such two year period, the voluminous file of affidavits herein indicate that demonstrations have been held at various stores at various times, two of which were held in the city of Cleveland, in which parades of workers, parades of men from the headquarters of the Amalgamated, carrying banners and baloons, have marched to the store fronts of Richman's and made what they considered demonstrations before the same, photographs of which are included in the record as appended to affidavits, and the same has happened in many cities throughout the country. The record is replete with various types of interference on the part of the pickets with prospective customers, it is replete with incidents of prospective customers "unwilling to cross a picket line"; of union mechanics called to service the stores and buildings "unwilling to pass a picket-line," of truck-drivers about to deliver or about to accept their shipments "unwilling to pass a picket-line." In fact, the great accomplishment of all the activities of the Amalgamated herein described, has been in the number of prospective customers, union mechanics and drivers who refused to cross "the picket-line," whereas Peppercorn was the first in this hearing to state that it was not at all a picket-line. The Amalgamated claims it is all advertising. The Amalgamated has herein filed affidavits to the effect that they instructed their pickets not to interfere with such customers, or mechanics or drivers, and say they had no knowledge of such interference if, in fact, it took place.

It is the defense of the Amalgamated that it has a perfect right to conduct itself as it has because such is in accordance with its right of free speech and unlimited expression, and it is their claim that all of their activity has been done for the sole purpose of informing the public that the clothes sold by Richman are not "union made"; it is their claim that all of such activity has been for the sole purpose of promoting the sale of clothes to which is appended the "union label" and it is their claim as evidenced by various resolutions, including

the "Mandate" of their Convention, that all has been in accordance with their right to advertise the desirability of "union labeled" clothing.

Defendant's eminent counsel argue that the Amalgamated has been doing a perfectly lawful thing, while Company's eminent counsel argue that what has been done by Amalgamated herein has been done unlawfully. All counsel agree that the intention and purpose of the Amalgamated must be here considered, and that the court must, on the one hand, consider the good intentions which Amalgamated here expresses when it says it has instructed its pickets to be very circumspect, and when it says it never knew that any harm arose from its activities, if in fact it did. On the other hand, we must consider what has been actually done on these seventy picket lines, and what has been the effect of the Amalgamated's activities; we must judge intention on the one hand by what is said, and on the other by what is done, because conduct can sometimes talk louder than words.

The Company has submitted affidavits from many cities describing the result of Amalgamated's activities; there is no question but that the language on the banners with which the seventy stores are picketed may be legally harmless and may indeed tell the truth. The banners merely say "Richman Brothers Clothes are not union made. Buy union made clothes. Richman Brothers' clothes do not have a union label. Buy clothes which have a union label."

Such banner may be innocent, and harmless; it may express absolute truth; but such banner on the doorstep of seventy stores, continuously for two years, may very well create a mental impression on the part of the public which is not at all contained within the language on the banner. It may well be that the Amalgamated has here figured out an ingenious device for creating in the mind of the public, including those who drive for unions, those who are members of unions, and those sympathetic to unions, the impression that a legal dispute exists between the Company and the Amalgamated; that the Company does not treat its employes fairly; that something is amiss, which causes the employes to place a picket line before the door of the company; that the company and its employes are having a dispute over working conditions or wages of its employes and that a strike is in actual progress at the immediate place of business being picketed.

The Amalgamated may here be taking advantage of that American psychological weakness whereby our minds receive and retain a first impression, because the American rarely reads fine print. Much litigation comes to all court-houses

because the average American does not read the fine print in his own contracts, or in his own insurance policies; that is why much embarrassment comes to Americans who sign papers never knowing who they have proposed for public office. It is proverbial with us that we are motivated by a first impression and do not have time or do not take time to read in full all that the banner has to say. Based on past experience we all immediately assume that a legal strike is in progress though we read not one word on the banner.

That such false impression was here many time created, no one can deny; the Amalgamated merely says "we didn't tell any tradesmen not to cross the picket line." The record is replete with instances of mechanics called to stores to do repair work,—because seventy stores in the course of two years require occasional outside maintenance by plumbers, electricians, glaziers and others,—and in many instances union mechanics refused to "cross these picket lines" because what these defendants were then doing had every appearance of being a legitimate picket line placed there over a legitimate dispute between employer and employee. They have here used such indicia of a legal dispute between employer and employee to the point where the banners have fooled even the members of the unions called to do mechanical work among these seventy stores listed. In some instances the mechanic realized that the picket line was only synthetic; that it was not real; and while he would refuse to cross the "picket line" while the banner man was marching, many mechanics would carry on their work before the "picket line" began and after it ended; thus, a few union men, who knew this picket line was not what it appeared to be, ignored it to that extent. However, the false impression was nevertheless created by the mere appearance of the bannering that a strike existed, that there was a difference of opinion between employer and employee, that employees were therefore out of work, and the sympathy which naturally flows to working men out of work has consequently flowed to the Amalgamated here, and it has thus in an indirect manner derived from its activities the very self-same benefits it would have derived if it actually did represent the employees of Richmans, and if they really did have a dispute with the employer, and if they really represented the employees of the employer, which in truth and in fact they do not.

As far as this court is concerned, there is no evidence before us that they represent a single employee of this company, because the witness before me refused to say how many, and rather boldly said that he would not answer the question of counsel if it was put. Therefore, to what-

ever extent the Amalgamated can indirectly benefit from whatever direct harm it has done to the Richman Company, it has herein improperly benefited.

There can be no doubt that many, many prospective customers stayed away because they "will not cross a picket line." There is no doubt but that the Company had had great difficulty getting merchandise delivered to them or sending shipments out; in some instances, members of the teamsters' union, who are very alert and who might understand that this was not a legal dispute at all, have made deliveries and accepted shipments; but nevertheless. the Company has been caused great inconvenience and difficulty, as the record shows, because of the false impression herein created by the false appearance of a legal picket line. To members of unions, drivers, union sympathizers, and the general public, the mere presence of the banner men in front of any one of these seventy stores is sufficient proof of a legal strike and is therefore very destructive of their business.

To make the claim that Richman suffered no loss in spite of these country-wide activities, Beryl Peppercorn testified from a newspaper clipping that the Company did better in '52 than in '51. Such testimony was not objected to. The Court considers his reading from some newspaper clipping as to the Company's profits as having no probative value. We also consider that the repeated assertions contained in the affidavits of Amalgamated to the effect that they had no intention of shutting off the service of mechanics and maintenance men is of very little probative value; no one knew better than did the Amalgamated that the minute it created these seventy picket lines on the seventy door-steps of the Company, that no mechanic would cross the line; no delivery men would deliver; no delivery men would receive. No one knows better than the Amalgamated that the instant the picket line is created, even though they call it an advertising line, that its mere appearance, and its mere existence, though it says not an audible word, nevertheless gives an immediate, inaudible, but definite and certain command to any member of a drivers or other union not to cross that line; the Amalgamated knew full well that in so far as advertising is concerned any mere advertising that the union label could get on that picket line would be of infinitesimal efficacy. Its real efficacy came from the false impression it created that the employer and employee have a legal dispute. The Amalgamated knows that that picket line constitutes an invisible barrier which puts every driver and mechanic in a position where he may cross it only at his peril both before the Amal-

gamated and his brother unionists. Unquestionably, thousands of customers stayed out of Richman's seventy stores these two years because they got a similar impression; they do not read the fine print, nor can they ascertain the significance legally, of the difference between the kind of a banner the Amalgamated here put out, and the kind of a banner they see when they approach any other picket line; to all appearances, there is no difference. The public was fooled as completely as were union mechanics and drivers.

The Amalgamated says it did not know that the Company was deprived of services of mechanics; it doesn't have to know; it knows that it has set up an invisible barrier which they do not dare to cross; it also knows that the invisible barrier is not there for its advertising efficacy but that it is there to accomplish the purpose it did accomplish, to wit: the isolation of seventy stores from union services, truckers or customers.

When the Amalgamated kept score-cards on how many people and packages entered or left, I believe they'd know a union driver when they saw one. When they motiviated all other unions in America susceptible of their influence into importuning the Company by mail, I take it they knew what was going on in all phases of their war. They knew full well of all results accruing from their improper campaign.

Thus, we find that when a store had to be moved from Brilliant, Ohio to Steubenville, Ohio that they had to do their moving in "off hours"; in the Cincinnati area, air-conditioning work had to be done ahead of time; in Cincinnati, representatives of five unions called on a store manager to tell him they represented forty thousand people who were offended at this so-called controversy. In Youngstown, repairs could not be obtained at a certain store; electricians would not cross the line; in Chicago, a neon sign could not be repaired. In St. Louis six delivery agencies refused deliveries; in one instance a store window was broken on June 29, 1951, which up to the date of the affidavit, 11-3-52, has not as yet been replaced. The Amalgamated's claim that it does not know of these preventions of mechanical maintenance work is not here the test; we must choose here between talk and results. The fact that the Amalgamated has set up an "advertising line" which looks so much like a "picket line" that it has deceived so many different classes of union-men and others, must be here considered, because conduct here indicates intentions far different than that of advertising only.

While the Amalgamated says it has not really harmed Richman, its newspaper continuously gloats over the degree of destruction of the Company's business which it has accom-

plished; it really exults over the damage it says it has done. It talks in terms of what percentages of its business the Company has been caused to lose; it claims that 30 to 50 percent of Richman's business was destroyed in one area whereas another suffered a loss of only one third of its business

If the Amalgamated itself should believe that its purpose here was the innocent purpose of advertising only, it should not have announced to the world through its official paper how effective it had been, percentage wise, in its intentional effort to destroy this company. It should not gloat in its paper over the destruction it accomplished and then tell even a state court that it really did not so intend.

No one can question the right of Amalgamated in the proper manner of telling the world and everybody in it what it thinks of this company. No one can question anothers right of free speech unless it is so used as to deprive others of their rights, equally sacred. No one can, in pursuance of his claimed right of free speech, destroy the rights of others to property the right of peaceful conduct of business, the right to protect and maintain their buildings, the right to create work for their twenty-five hundred odd employees, or the right of those twenty-five hundred to do the work; or the right to have seventy doorsteps untrammeled by an alleged advertising line which is a disguised picket line. This court does not believe they have such right and so declares. The Amalgamated has no monopoly on rights and has herein misused its own and destroyed the rights of many others.

Jacob S. Potofsky, general president of the Amalgamated, herein submitted an affidavit seeking to justify the conduct of Amalgamated throughout; he relates that it was all in conformity with the right of free speech and done in accordance with "a mandate" from their "convention," and all for the purpose of promoting the use of the union label. He rather bitterly attacks the Company and its history and says that he will not "get down in the gutter with them." Most of his affidavit consists of hearsay, opinions and conclusions. It is perfectly apparent from a reading of the affidavit that he has an utter personal detestation of the employer because he has been unable to unionize its employees. In fact, the feeling among the defendants in general, is that the Company has wronged them because its employees are not unionized. Beryl Peppercorn made it very clear that his feelings against the Company arise from what he claims is their "prevention" of unionization of their own employees. There is nothing in the entire record to indicate that the Company has ever done anything to prevent such unionization. The

only evidence before the court is that this entire economic war was started on no more provocation than one man's anxiety to start it before another had a fair chance to answer a letter. Why the Amalgamated gave up on unionizing the employees and seeks to have the employer do this job, the court does not know, but Peppercorn's testimony as to how the employees have ignored him for decades gives rise to the inference that the employees do not so desire, either because they are well treated or for other reasons. Nevertheless, the Company herein has a right to operate its business without unionized employees; the employees have a right to remain unorganized and the union has a perfect right to try and organize them in every possible proper way, but it has no right to bludgeon the Company into doing its work of organizing employees just because it prefers that the Company perform its own task.

It is the claim of the plaintiff herein that the Amalgamated has declared this economic war upon it for the purpose of forcing it to force its employees to join Amalgamated. It is perfectly apparent that the Amalgamated has made suggestions for decades to these employees and the employees have never chosen to become organized; it is likewise equally apparent that if they are to be organized, that is the job of the union and not the company. No other method is ever good for unionism itself.

Defense counsel suggests that Company's delay of eighteen months before filing this action should deprive them of relief on the ground of laches. Even though this Company had the patience of Job, the court does not agree that its patience gives defendants any rights to an injustice in perpetuity.

It is this court's opinion that the Amalgamated is not engaging in the activities alleged for any advertising purpose at all. Whoever invented this ingenious method of deriving benefits from the false impressions created did not have advertising in mind, as his primary purpose. The whole procedure of seeking to gain this end by embarrassing others, by spending years on their doorstep, by the use of marchers and baloons and banners and circular and rectangular parades and all of the other methods of embarrassment, harrassment and damage herein created, smacks of a psychology wholly alien to ours; it is easy to see that if it is ever approved by courts it will be but a preliminary to other and more drastic moves such as have been utilized in alien lands where demonstrations are made for the purpose of demonstration.

The greatest protection unionism has in these United States is the right to properly picket an employer with whom it has a dispute; its most effective method of getting help from its

friends is by letting the world know of its difference with an employer when it has such a difference; and any union that pretends to have such a difference when it doesn't have such a difference, and which sets up a pretended picket line for the purpose of deceiving other union members and the public for the benefits thereby accruing to it from such unlawful misconduct, is jeopardizing the right of all unions to the use of their most effective weapon. Defendants have here harmed Richman greatly, but they have harmed legitimate unionism far more.

The cleverly disguised method whereby Amalgamated has herein benefited at the expense of the company constitutes the obtaining of whatever benefits it derived by the false pretense that it set up a legitimate picket line, which it most certainly did not. This court does not agree that defendants are entitled to derive such benefits perpetually under such conditions.

The within hearing has been delayed for five months so that the Amalgamated could carry to the limit its claim that States or State Courts have no longer any right to assume jurisdiction over its within activities. This court disagrees as thoroughly with Amalgamated on this proposition as did the U. S. District Court. We hold they are amenable to our State laws and the jurisdiction of our State Courts. We hold that under our laws their actions have not been for the advertising purpose they pretend but for the unlawful purpose of forcing an employer to force that unionization of its help which for years that same help has refused at the behest of Amalgamated. We hold it unlawful to thus seek to strangulate Richman's business unless it will perform Amalgamated's task of organization; that it violates the public policy of Ohio to thus punish another for one's own failure; that it was contrary to all law and justice to have subjected Richman to such nation-wide attack because the recipient of a letter was out of town a few days, and its sender was over-anxious to be offended.

Of course, if there was any sincerity in Amalgamated's claim to advertising herein, then in these two years of picketing, surely there would have been at least one occasion where its pickets would have said to one union driver or one union mechanic: "Go on in. This is not a strike; this is not a picket-line. We are only advertising." Not one such instance ever took place. Instead, the Amalgamated invented and devised many new methods of pressuring other unions into pressuring this employer into pressuring its employees. Its sole purpose and accomplishment was pressure.

Considering the damage daily done by the unlawful activities of Amalgamated, both of a tangible and intangible nature, we do not believe Richman has an adequate remedy at law; its remedy is in long-delayed equity.

As Judge A. V. Baumann recently stated in cause No. 645,411 in this court as of March 19, 1953, the case of **Crosby v. Rath, 136 Oh St 352** is still our leading authority on the subject.

The fourth syllabus in **Andersen v. Brotherhood, 156 Oh St 541** has most direct application hereto and in one sentence it decides our question, to this effect:

"The right of free speech is predicated on the lawful exercise of such right, and if, through conspiracy or unlawful conduct, the result of its exercise by such means unlawfully injures another in his property rights, the guaranty ceases and the exercise of the claimed right by such means may be enjoined or prohibited."

Because such is our law and our public policy and because Amalgamated has unlawfully injured so many others in their rights, injunction must be had against it. Counsel will please prepare a Journal Entry accordingly.