78 So.2d 673

GODCHAUX SUGARS, Inc.

v.

Paul CHAISSON et al.

The SOUTH COAST CORPORATION

v.

Paul CHAISSON et al.

No. 41569.

Jan. 10, 1955.

Rehearing Denied Feb. 17, 1955.

Dodd, Hirch & Barker, New Orleans, for appellant.

Harvey Peltier and Donald Peltier, Thibodeaux; Milling, Saal, Saunders, Benson & Woodard and Baldwin, Haspel & Molony New Orleans; for appellee.

FOURNET, Chief Justice.

The plaintiff corporations in these consolidated cases, Godchaux Sugars and South Coast, alleging they each own and operate large plantations, sugar mills, and

refineries in south Louisiana[1] and in connection therewith are engaged in the trade or business of planting, cultivating, growing, harvesting, buying, processing, and selling or using raw sugars and by-products, as well as refining and selling refined sugar and by-products, instituted these suits to restrain the named defendants[2] individually and as officers, agents, and employees of an organization known as the Sugar Workers Local No. 317 of the National Agricultural Workers Union (AFL), from pursuing a course of action designed to damage petitioners in their trade or business, and also to prevent them from stifling competition by interfering with and interrupting the trade and business of the plaintiffs while, at the same time, permitting other growers, mills, and refineries to operate without interference, all of which is alleged to be the result of a conspiracy or combination in restraint of trade, inimical to the public interest, contrary to the public policy of the state, and, more particularly, in violation of Section 14 of Article XIX of the LSA–Constitution of 1921 and the statutes of the state adopted pursuant thereto. The petition further alleges the named defendants and others acting in concert with them (unknown to plaintiff and too numerous to name) joined in this conspiracy or combination for the purpose of compelling plaintiffs to recognize the Sugar Workers Local No. 317 as the representative and bargaining agent of the agricultural employees on their plantations, and to that end, by artifice, force, intimidation, as well as threats of force, intimidation, and bodily injury, induced the agricultural workers on the plantation to cease work through the guise of a so-called "strike" that was timed to come shortly after the commencement of the sugar cane harvesting season,

1. Godchaux owns plantations in Lafourche, Assumption, and St. John the Baptist parishes; processing mills in Lafourche and St. John the Baptist; and a sugar refinery in St. John the Baptist. Its factory and grinding mill is located at Raceland in Lafourche parish where this cause of action arose, and it has five plantations in this parish, where cane is grown, i. e., Raceland, Utopia, Mary Plantation, Upper Ten, and Scudday. South Coast owns and operates plantations in Lafourche, Terrebonne and St. Mary Parishes; cane processing mills in Terrebonne and St. Mary, and a sugar refinery in Lafourche. Its factory and refinery in Lafourche is located at Mathews, and its plantations in this parish are Pecan Tree, Georgia, Home Place, New Hope, and Gayosa.

2. The named defendants in the Godchaux case are: Paul Chaisson, Vanton Larousse, Isaac Epps, Octave David, Henry E. Hasiwar, Frank Lapeyrolerie, Felix Dugas, Cleveland Hogan, Tony Dominique, Clarence Sylvan, Andrew Larouse, Nilton Larouse, Luse Ockman, Willie Campbell, Robert Washington, L. J. Bolette, and Louis Guidroz. Nelson Naquin, Alton Barilleaux, and Joseph Guidry were also named but the suit as to them was dismissed as of non-suit because of failure to serve citation. The named defendants in the South Coast case are: Paul Chaisson, Henry E. Hasiwar, Frank Lapeyrolerie, Felix Dugas, Joseph Guidry, Gabe Adams, Jesse Adams, Albert Roussel, Narwed Keller, Edgar Ledet, Louis Perkins, Willie Ingram, Volcar Dominique, Victor Larousse, and Alley Naquin.

the defendants knowing such action would cause the plaintiffs immediate and irreparable injury since cane is a perishable crop that must be harvested and processed within a relatively short space of time or be lost. Additionally, it is alleged that these defendants placed pickets at the entrances of the mills and refineries (including the railroad crossings), where employees were working under collective bargaining agreements with another union containing "no strike" clauses, the specific objective of such picketing being to cause these employees to breach the "no strike" agreements. The damage resulting to plaintffs, for which they have no adequate remedy at law, is alleged to be immediate, irreparable, and incapable of ascertainment, although tantamount to the destruction of their businesses.

The defendants filed a number of exceptions and pleas, all of which were referred to the merits. They then answered, denying generally the allegations of the petition, although it was affirmatively averred the members of Sugar Workers Local 317 voted to strike and did engage in a strike or concerted activity against the plaintiffs beginning on October 12, 1953, and have, since that time, withheld their services from the employers. They asserted their right to engage in a strike and to peacefully picket, distribute literature, to assemble, and to induce employees of petitioners by peaceful means to refrain from working or to refrain from returning to work is protected by the First, Fifth, Thirteenth, and Fourteenth Amendments to the Constitution of the United States, as well as Sections 1, 2, 3, 4, 5, 6, 7, 8, and 9 of Article I of the 1921 Constitution of Louisiana, LSA.

The trial judge recognized the right of the defendants to organize for collective bargaining purposes, and also their right to strike in order to secure employer recognition and negotiation. He concluded, however, that a work stoppage at the sugar factories and refineries during harvesting season is so vitally important to the economy of the state and to the public interest that it is tantamount to a serious and unprecedented emergency that transcends the right of the defendants to picket these mills to compel recognition of the organization of the field workers, and their right in this respect must be restricted. He accordingly rendered judgment permanently enjoining the activities of the defendants, individually and as officers and members of Local 317, in picketing the refinery, factories and plantations of the plaintiffs in Lafourche parish; threatening physical harm, injury or damage to the plaintiffs, their employees or property; conspiring to damage the plaintiffs in their trade or business for the purpose of securing recognition of their organization; and persuading or inducing any of the employees of plaintiffs at the refinery and factories to refrain from working in violation of existing collective bargaining agreements negotiated with locals affiliated with the CIO The defendants have appealed.

In their brief the defendant-appellants are contending (1) that Local 317, an unincorporated association, and its members cannot be sued, served, or bound by suit against its individual members and officers in the absence of tortious acts; (2) as agricultural workers they have a right to organize and to take all legal economic steps necessary to secure employer recognition and negotiation, including the publicizing of their dispute by the picketing of a premise or business of the offending employer that is manned by employees covered by a collective bargaining agreement with another union containing a "no strike" clause, and (3) such picketing cannot be enjoined in the absence of illegal methods or an unlawful purpose even though it causes loss and injury not only to the employer but to the entire community. In any event, they assert the injunction as issued is too broad to fit the specific needs of the situation and should be "tailored" accordingly.

In order that the issues thus raised may be brought into correct focus for discussion and decision, it is necessary that the events leading up to the enjoined picketing, as well as the background of the industry involved and its importance to the economy of local communities as well as to the state, be given in some detail. In certain important aspects this has been stipulated by counsel, as will be pointed out where necessary.

By reason of weather and soil conditions, Louisiana's sugar cane industry is largely concentrated in 12[3] of our 64 parishes, the acreage of cropland available for cultivation therein ranging from 22,706.3 acres in the parish of St. John the Baptist to 75,695 acres in Iberia, though there is considerable acreage in 9[4] other parishes, ranging from 50 acres in East Feliciana Parish to 17,040.3 acres in Lafayette. In these 21 parishes—sometimes referred to as the Sugar Cane Belt of Louisiana, bordering, as it were, both sides of the Mississippi River and extending into the reaches of its delta lands in the extreme south-central part of the state—there were, in 1953, according to official records secured independently by the court from the United States Department of Agriculture, 549,045.1 acres of cropland, though the actual acreage under cultivation, because of control through government allocations under the Sugar Act of 1948, 7 U.S.C.A. §§ 1100–1160, amounted to 304,077.2 acres. This acreage was distributed throughout 4,010 farms and/or plantations, ranging in size from 0.1 acres to 1,000 and over. They were operated by some 7,540 growers planting as individual owners, on a share-crop basis, or under some other arrangements, such as a joint venture.

3. Ascension, Assumption, Iberia, Iberville, Lafourche, Pointe Coupee, St. James, St. John the Baptist, St. Martin, St. Mary, Terrebonne, and West Baton Rouge.

4. Avoyelles, East Baton Rouge, East Feliciana, Lafayette, Rapides, St. Charles, St. Landry, Vermilion, West Feliciana.

In 1953 some 5,758,846.9 tons of cane grown in this state were processed into sugar and some 67,872.4 tons were marketed for syrup. For the grinding of this tremendous tonnage there were only 54 mills and for the processing of the raw product only 7 refineries. In the Parish of Lafourche, where this case arose, there were only 5 mills and 1 refinery, while the planted acreage in that parish yielded 609,936.5 tons.

It is apparent from these figures that the sugar cane industry is of tremendous importance to the economy of the parishes within the Belt. It is so vital to the welfare of those living in this section that any threat to the industry is a threat to the economy and welfare of the entire community. Indeed, in many parishes it is not only one of the largest industries, it is the only industry.

The government has, for many years, controlled the sugar cane industry in this state (as it has also in other states and territories) under the provisions of the Sugar Act of 1937, 50 Stat. 903, and the Sugar Act of 1948, 61 Stat. 922, 7 U.S.C.A. §§ 1100–1160. At a hearing, which is held annually in Thibodaux, Louisiana, the government determines by quota allocations, the acreage of available cropland that is to be planted and cultivated in any given year in this state. It also determines the price the grower is to receive for his cane, the working conditions of the agricultural laborers on these farms, and their minimum standard wages.[5]

In certain sections the cane, by reason of favorable weather conditions, may be harvested the year round, as in Hawaii, or over a six-month period, as in Florida. In Louisiana, however, due to precarious weather factors, the harvesting season is extremely short. The cane is not sufficiently "ripe" for harvesting until some time near the middle of October. From that time the harvesting of the cane is a race against time, for the first frost or freeze that falls before the cane is cut will destroy the crop. Additionally, it is imperative that the cane, once harvested, be put through the mills as soon as possible, for, unlike other agricultural products, cane cannot be stored or refrigerated. For this reason, during the harvesting period the mills operate without interruption on a continuous 24-hour schedule; the mill owners not only grind the cane from their own farms, but also the cane of many hundreds of small farmers who have no mills and who are totally dependent upon these mills for the processing of their product; otherwise, their crop, too, will be a total loss.

This is very ably and impressively pointed out by the trial judge in his written reasons for refusing to sustain the defendants' ex-

5. There is testimony to the effect that the agricultural laborers are paid wages in excess of this minimum standard and also to the effect that because of the government's price controls, the industry cannot pay higher wages and continue to function from an economic standpoint.

ceptions and motion to dissolve the temporary restraining order, and is borne out by the record. As the trial judge states, "The growing and processing of sugar cane in this semi-tropical section is like no other industry in the sense that it is not possible to close a sugar factory indefinitely during the harvesting season and resume operations where they were left off, as is the case in most manufacturing plants. This difference is emphasized by the fact that the growing and processing of sugar cane are joint operations. In this area, harvesting without processing is as unthinkable as liberty without law. The two are inseparable. Harvesting time is not a matter of purely individual choice, but depends upon natural conditions beyond control. When harvesting time comes, cane must be harvested expeditiously or it will eventually suffer the damaging depredations of freezing weather and become a total loss. When harvested, it must be processed within a reasonable delay or suffer deterioration. A most important consideration is that the growing of sugar cane is not a one-year operation. Economical and profitable cane production does not involve planting each crop season, but depends generally upon the production of at least three crops from one planting." Continuing, he points out that "exposure to freezing weather and the subsequent souring and deterioration of sugar cane causes a deterioration in the stool of the cane below the surface of the ground, and a consequent loss in production in the ensuing crop season. * * * If an entire crop were to be lost because of failure to harvest and process it, there would be no cane left for the planting of a succeeding crop because the cane stalks themselves constitute the seed used in planting." He characterized the annual sugar cane harvesting and processing as an "annual emergency," and disruption thereof as a presage to "irreparable damage." He held any affirmative act intended to disrupt, deter, or prevent such operations "wrongful," likening these operations to a vessel that must make port within a limited time or be lost to the ravages of the elements.

Counsel for defendants concede this to be true, for in a stipulation signed by them it is stated: "The harvesting of sugar cane must be commenced in South Louisiana around the middle of October, depending upon the maturity of the crop. Once commenced, such harvesting must proceed as expeditiously as possible because unless the crop is harvested before adverse weather conditions, such as a heavy freeze, occur, the crop can be lost in part, or even wholly destroyed. In order to save the crop when harvested, it is indispensable that it be promptly, within 4 or 5 days after the cane is cut, processed into sugar and molasses at a grinding mill, or it will sour and become unfit for processing. If there is no grinding mill in operation and available for the processing of the harvested cane, the crop remaining unprocessed will inevitably be lost."

The record further shows that the plaintiffs in these cases had, for many years, entered into bargaining agreements with local organizations of the CIO union covering the workers in the mills and refineries, which were classed as industrial laborers, and, recognizing the importance of keeping these mills in continuous operation during this crucial time, had insisted upon the inclusion in these contracts of clauses pledging the workers not to strike during the existence of the contracts. These contracts were never violated prior to 1953.

During the early months of 1953 representatives of the National Agricultural Workers Union, an affiliate of the American Federation of Labor, were sent among the agricultural laborers in the Sugar Cane Belt and purportedly organized Local No. 317, an area-wide Union divided into five districts.[6] In July these officials requested that 9 (including the plaintiffs) of Louisiana's 7,540 growers meet with them for the purposes of negotiating a collective bargaining agreement and when these growers refused to comply with this demand the Louisiana Department of Labor, at the request of the Union, called a meeting for the purpose of securing conciliation. When the employers failed to attend this meeting[7] the membership of the Union was allegedly polled and voted 1808 to 8 in favor of striking. The growers were never officially notified of this strike action, but letters were later addressed to 23 of the growers requesting a meeting, but this never materialized. Soon after harvesting operations began, and, according to the testimony of the principal organizer, Henry E. Hasiwar, *at a time contrived to hinder and disrupt the processing of the cane,* a strike was called against 5 of the 23 employers that had been requested to meet with the Union representatives. As a result between 50 and 75 percent of the farm laborers failed to report for work, with the result that many hundreds of tons of cane were left to "sour" in the fields.

On October 16, 1953, the workers in the mills and refineries were advised by Union letter that a strike was in progress in the fields and their cooperation was requested. The letter closed with the appeal: "You know what to do." Although no effort was ever made by the organization to picket the plantations, that night, around midnight, the field laborers threw a picket line around the Raceland mill of Godchaux and the union workers in that mill refused to cross these lines. For reasons that are not clearly reflected in the record, this line was short-

---

6. It is apparently conceded for the decision of the issues raised in this case that this organization is legally constituted.

7. Agricultural laborers are specifically excluded from the definition of an "employee" in Louisiana's statutory provisions governing conciliation, mediation, and arbitration of labor disputes and the Department of Labor had no authority, therefore, to compel such a meeting. (LSA–R.S. 23:861–23:876, and particularly Paragraph 2 of Section 862.)

ly thereafter withdrawn and the workers returned to the mills.

The mill and factory workers were further circularized by Union letters and although Hasiwar testified he was aware of the critical importance of the continuing operation of the mills and that the workers there were employed under agreements prohibiting strikes, he ordered full scale picketing operations around these factories on October 22. He first stated the object of this picketing was to publicize the existence of the labor dispute in the fields. He admitted under cross-examination, however, that the Union was guided in this activity by its own estimation of the most effective moment to exert economic force and pressure on the employers to compel recognition of the field laborers and he felt he had a better chance during this very critical grinding period. He conceded, in fact, that the real object of the picketing was to shut down the operation of the mills.

His strategy was effective, for despite specific provisions in their collective agreements prohibiting the mill workers under any and all circumstances or conditions from engaging in strikes of any nature, sit-downs, sympathy strikes or stoppages under threat of loss of seniority rights and summary discharge, the majority of the workers refused to cross the picket lines. As the trial judge points out, some of these factory workers "residing on the property of (South Coast) within the picket lines, their places of residence being between the picket lines and the factory, left their residences and went to a point beyond the picket lines and thereafter refused to cross the picket lines to report for work at the time appointed for their particular shift." As a result of such failure or refusal to report to work, the factories were kept in operation for a period of between 18 and 20 hours only by virtue of the fact that some factory workers remained at work beyond the time of their shift and were helped by independent farmers with previous factory experience. At first the picketing field laborers were even actively assisted by officials of the CIO local representing the mill workers, in violation of specific provisions in their bargaining agreements to the effect that if they did not order these workers to return to their jobs their action would be considered a violation of the agreement.

To prevent the shut-down of the factories during this crucial period and the resulting irreparable damage to themselves and the small farmers dependent upon these mills for the grinding and processing of their cane, as well as to relieve the workers who had remained at their posts in the mills during long hours, the plaintiffs, late in the afternoon of October 22, 1953, secured a temporary restraining order. When this was later confirmed as a permanent injunction, despite the protests of the defendants, they appealed.

The first contention relied on for reversal (that an unincorporated association and its members cannot be sued or

served through individual members or officers) is clearly without merit. This issue under an identical factual situation[8] was decided adversely to the defendants in Douglas Public Service Corp. v. Gaspard, 225 La. 972, 74 So.2d 182. Counsel's argument that the decision in the Douglas Public Service Corp. case has no application here since the defendants were not proved to have engaged in tortious acts comes, we think, with ill grace since violence, threats, and intimidation were not only alleged, but numerous witnesses were available to prove these allegations and they were only excused when counsel for defendants conceded, for the purpose of saving time, that if a restraining order were to issue it should cover violence and harm to person and property, and more particularly so since the plaintiffs only acquiesced therein with the understanding they were not thereby waiving or relinquishing their rights under these allegations of violence. Such concession on the part of counsel for defendants, while obviating the necessity of hearing testimony to substantiate these allegations, was also tantamount to an admission that violence and tortious acts have, in fact, occurred during the course of this dispute, and on this ground alone, the issuance of the injunction would be justified under the Douglas Public Service Corp. decision.

Additionally, we think particularly pertinent and appropriate here the remarks of the trial judge to the effect that "time is of the essence in the nature of the relief prayed for in this case (and) to require the ascertainment of individual membership of an unincorporated association and thereafter individual citation as conditions precedent to the granting of relief,—and thereby require plaintiffs to gather information almost exclusively within the knowledge of defendants, without whose help it would be impracticable or perhaps even impossible to gather, and from whom hindrance and obstruction, rather than cooperation, could be reasonably anticipated, —would be tantamount to a denial of relief. To hold that an unincorporated group must be individually named and cited before it is susceptible to restraint would be equivalent to holding that, by subterfuge of unincorporation, group action transcends individual rights and is unlimited and unrestrictable except within the purview of the criminal statute, or that corporations unauthorized by law cannot be restrained from doing irreparable injury except through the process of individual identification. We cannot in good conscience or sound logic reach that conclusion in the face of alleged irreparable injury."

8. There were twenty-one defendants in that case who were named and sued individually and as officers, agents, and members of the Oil Workers International Union, Local No. 447, affiliated with the CIO. Here, the defendants were not only sued individually and as members, officers, and agents of Local 317, but it was specifically admitted during the trial that they were officers and members, and, in fact, actively engaged in the picketing restrained.

The next contention of the defendants—that they have a right to organize and to exert economic pressure to compel recognition, including publicizing their dispute by picketing the mills manned by organized workers pledged not to strike, and even though the employer and the entire community be irreparably injured—is predicated, primarily, upon the theory that such picketing is the assertion of their right of freedom of speech guaranteed by the federal and state constitution and, as such, cannot be enjoined so long as the means is legal and the purpose sought lawful.

▆ It is true that the United States Supreme Court has likened picketing to speech, but this sweeping analogy as first enunciated in Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, has since been greatly refined and restricted. In Hughes v. Superior Court of State of California, 339 U.S. 460, 70 S.Ct. 718, 721, 94 L.Ed. 985, the United States Supreme Court, sanctioning the state court's action in enjoining peaceful picketing to compel proportional racial hiring that subverted and contravened the state's public policy as judicially declared, said: " '(T)he domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states,' * * * no doubt induces liberty of thought and appropriate means for ex-

pressing it. *But while picketing is a mode of communication it is inseparably something more and different.* Industrial picketing 'is more than free speech, *since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another,* quite irrespective of the nature of the ideas which are being disseminated.' * * * Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But *the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication.* The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. * * * However general or loose the. language of opinions, the specific situations have controlled decision. *It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent.* Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * '*A state is not required to tolerate in all places and all circumstances even peaceful picketing * * *.*' " [9] (Emphasis added.)

9. The United States Supreme Court has approved the inclusion of "no strike" clauses in bargaining agreements and has held that breach of such clauses by refusal to cross picket lines is *an unfair labor practice* warranting the discharge of the offending employee. See, National Labor Relations Board v. Rockaway News Supply Co., Inc., 344 U.S. 863, 73 S.Ct. 106, 97 L.Ed. 669. The record in the

Inasmuch as we have already concluded that the manner in which this picketing was conducted was illegal under the foregoing authorities, the defendants' contention is without merit. But we think the question posed here is of such importance that we may concede, for the sake of argument, that the manner of picketing was legal. This focuses for our decision the very vital question remaining for decision, that is, whether the state's public policy permits the assertion of the right to organize and to picket for recognition at the expense of the economy of the state, and at the risk of entirely destroying or wiping out one of the state's principal industries.

■ This court, in Douglas Public Service Corp. v. Gaspard, 225 La. 972, 74 So.2d 182, 187, recognized "that the laborer in his effort to secure better working conditions and wages is well within his right to organize, to bargain, and to take any and all needful steps to lawfully accomplish this end, including picketing,"[10] likening this right to freedom of speech, religion, and to life and liberty itself, all of which are essential to the pursuit of happiness;

but we also very succinctly pointed out that "by the same constitutional guarantees that make these rights secure for the laborer, the employer is also insured he will not be deprived of his property except by due process of law and that the courts shall be open to him for the protection of his rights."

■ The testimony in the record conclusively establishes—and, indeed, it is admitted by the defendants—that because of the short season in Louisiana and the peculiar urgency surrounding the harvesting of this very perishable crop, any action that has for its object the closing of the vitally important mills during this crucial period will not only destroy the entire crop of a given year, but, because of spoilage in the fields, will destroy the crops of the next two succeeding years. We cannot close our eyes to the fact that such action would be tantamount to the total destruction of this industry, for no industry can sustain such terrific losses over a three-year period and still survive economically. The eventual repercussions on the economy of the state, and particularly on those parishes

---

instant case clearly discloses the industrial mill workers refused to cross the picket line thrown up by the field workers despite the inclusion of "no strike" clauses in their bargaining agreements.

10. Inasmuch as the sugar cane industry is controlled by the federal government, which determines the acreage to be planted, the price paid for the cane, the working conditions of the laborers, and their wages, it would seem that any

grievance with respect to those wages (there is no apparent complaint with respect to the working conditions) is a matter that comes within the purview of that authority and should be presented by the aggrieved laborers at the annual hearings, particularly since it is attested that the industry cannot stand increased wages unless there is commensurate increase in the prices paid the growers for their cane.

within the Belt, would beggar contemplation. The guarantees of freedom of speech, even if picketing and speech are held to be identical, cannot be maintained in the face of such irreparable injury to property and economy and we are compelled to hold, therefore, that the picketing of the mills of the defendants under the circumstances established here is contrary to public policy and that the trial judge was justified in issuing the injunctions.

In this court, in oral argument,[11] the defendants renewed their plea of prematurity and exceptions based upon the contention that the plaintiffs failed to follow the procedure set out in LSA–R.S. 23:841–23:849 (commonly referred to as the Little La-Guardia Act) prior to seeking injunctive relief.

▮ In the Douglas Public Service Corp. case we held that the legislative statutes prescribing procedural rules for obtaining needful writs and processes would be upheld so long as they did not violate our basic law, but that such acts, whether procedural or substantive, infringing or trenching upon the constitutional prerogatives of the courts, could not stand. As in that case, it is evident under the facts here that resort to these statutory provisions would, in effect, have closed the doors of the courts to the plaintiffs seeking relief from impending irreparable injury as well as destruction of the private and property rights. Additionally, it would have so

hampered the court in granting relief their constitutional guarantee of protection would amount to no protection at all and would, actually, deprive them of their property without due process of law. These exceptions are, therefore, without merit.

The defendants rely on the cases of Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, and Building Service Employees Intern. Union Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045, to support their argument that "Even if the court were to find unlawful methods or an unlawful purpose the injunction contravened the defendants' rights and should have been tailored to fit the specific needs of the situation."

▮ Counsel has failed to point out in what respect the judgment of the lower court requires "tailoring" beyond quoting excerpts from these cases that, in themselves, disclose they have no application to the factual situation here presented.

For the reasons assigned, the judgments appealed from are affirmed, at the cost of the defendants.

HAMITER, J., concurs in the decree.

HAWTHORNE, J., concurs with written reasons.

HAWTHORNE, Justice (concurring).

I am of the view that defendants' plea of prematurity and their exceptions based up-

11. These points have not been mentioned in written brief.

on the fact that the plaintiffs failed to follow the procedural requirements set out in R.S. 23:841-23:849, commonly referred to as the "Little Norris-LaGuardia Act", before seeking injunctive relief should be sustained.

In my dissenting opinion in Douglas Public Service Corp. v. Gaspard, 225 La. 972, 74 So.2d 182, I stated that I did not agree with the holding of the majority of this court that the procedural requirements of the statute were unconstitutional, and I fully set out there the reasons for my view. *I am still of the same opinion.* However, my view is a minority one, and, under the jurisprudence of this court as established in the Douglas case and in this case, the statutory provisions setting up these procedural requirements are unconstitutional. Therefore, since it would serve no purpose and would be a vain thing for me to continue to dissent, I subscribe to the majority holding only because this holding is now the law of this state in cases of this kind, with the hope that the majority will in time realize its error and reverse its position in the matter.

On Application for Rehearing

1. Section 2 of Rule X of this court, adopted October 4, 1951, and in effect since January 1, 1952. See, also, Sorbe v. Merchants' Ins. Co., 6 La. 185; Rightor v. Phelps, 1 Rob. 330; Garland v. Holmes, 1 La.Ann. 405; Stephens v. Duckett, 111 La. 979, 36 So. 89, and State ex rel. Murtagh v. Dept. of City Civil Service, 215 La. 1007, 42 So.2d 65.

PER CURIAM.

In their application for rehearing the defendants are, for the first time, and contrary to the rules of this court and the jurisprudence thereof,[1] seeking to raise Federal constitutional issues that were not raised or passed on when the case was originally before us, their contention now being that even though they employed illegal means and purposes in this labor dispute, the injunctions as issued by the district judge and affirmed by us nevertheless infringes and otherwise deprives them of certain rights claimed to be guaranteed by the Federal constitution.

This contention, developed in a most ingenuous manner, would lead the reader to understand or believe the defendants were forever enjoined by the lower court from organizing, striking, and *peacefully* picketing the plantations and mills of the plaintiffs, and that we, in affirming this decree, held in effect, and on the basis of a so-called local emergency doctrine raised by us for the first time,[2] that the public policy of this state prohibits agricultural laborers, merely because they happen to be working with perishable crops, from exercising their constitutional right to strike,

See further Godchaux Co. v. Estopinal, 251 U.S. 179, 40 S.Ct. 116, 64 L.Ed. 213.

2. To the contrary, the judgment of the lower court, as reflected by the judge's reasons quoted extensively in our opinion, is predicated on this same foundation.

to *peacefully* picket, and/or to take any effective *legal* action to secure better wages and working conditions. Finally, and without detailing in any way their specific complaints with respect thereto, they claim the injunction as issued is too broad in scope, and, because of our failure to "tailor" or "clarify" the same, "they have been deprived of their basic constitutional rights and guarantees without even having been afforded a hearing before a court of law in final determination of their legal rights."

█ Inasmuch as these matters are being raised for the first time in application for rehearing, this court would, ordinarily, dispose of the application summarily without further consideration, under the authorities cited in footnote No. 1. However, to clear the confusion created by the application and to disabuse the minds of the applicants as to their claimed fears, it is apt to observe that the opinion reflects, in Paragraph 4, the only errors assigned by the defendants in appealing from the decree of the district court in so far as pertinent here—and the crux of the objections then levelled at that judgment—is that the defendants, "as agricultural workers * * * have a right to organize and to take all

*legal* economic steps necessary to secure employer recognition and negotiation, including the publicizing of their dispute by the picketing of a premise or business of the offending employer that is manned by employees covered by a collective bargaining agreement with another union containing a 'no strike' clause,[3] and * * * such picketing cannot be enjoined *in the absence of illegal methods or an unlawful purpose* even though it causes loss and injury not only to the employer but to the entire community." (Emphasis supplied.)

If there were any doubt as to this issue being correctly stated in the opinion, we invite attention to the following quotation from pages 10 and 11 of the brief of defendants: "*In the absence of unlawful methods or unlawful purposes*[4] the prohibition of the picketing and other activities of defendants embraced in the permanent injunctions was contrary to the law and public policy of Louisiana and in derogation of the constitutional rights of the defendants under the Constitution of the United States and of Louisiana." (Emphasis supplied.)

Clearly, therefore, under the specific assignments of error made by the defendants

3. Although defendants now maintain they did not attempt to and did not enlist the aid and assistance of the union employees in the mills, or encourage them to strike, the testimony in the record establishes the contrary to be true, as does the circulation among these employees of the several letters issued by Local 317 enlisting their active support.

4. The appellees in their pleadings, during the trial in the lower court, and on appeal here took the position that both the purposes and the methods employed were illegal and that, accordingly, no federal or constitutional question was raised.

themselves, they thus precisely prescribed the issues we were requested to pass on, i. e., whether or not the methods and purposes were legal and lawful, and on this issue we found as a fact these activities were unlawful and illegal.

The effort of applicants to show that the effect of the court's decision is to forbid to this class of laborers "because of the happenstance that they are engaged in farm work and in the processing of a perishable crop, a fundamental constitutional right," [5] is trite to say the least when one reads the opinion which clearly and unmistakably recognizes, as did the trial judge, the right of agricultural workers and laborers to organize, to strike, and to picket to secure recognition and collective bargaining for better wages and working conditions. But we did point out that this right cannot be paramount to all other rights for " 'by the same constitutional guarantees that make these rights secure for the laborer, the employer is also insured he will not be deprived of his property except by due process of law and that the courts shall be open to him for the protection of his rights.' "

The final complaint, with respect to the scope of the injunction as issued, is as vague in the application for rehearing as it was on original hearing, as evidenced by the sole comment in original brief, i. e.,

*"Even if the court were to find unlawful methods or an unlawful purpose the injunction contravened the defendants' rights and should have been tailored to fit the specific needs of the situation."* (Emphasis supplied.)

In their application for rehearing they do not point to any specific right we have failed or refused to pass on that was raised. They do not tell us in just what way they would have us "tailor" the injunction. Instead, they resort to generalities which are fairly summarized in Paragraph 18 of their application as follows:

"Defendants urge the court that regardless of the determination of the issues involved herein as they relate to the picketing of plaintiffs' mills and plant sites, different issues are raised in relation to the balance of the injunctive order issued by the district court and that these issues are vital to defendants' constitutional freedoms and should be finally determined by the court, and that the present judgment and opinion do not adequately state the disposition of defendants' arguments and pleas that the district court injunction violates their right of free speech, assembly, organization and strike."

As shown above, applicants are thus attempting to argue issues not heretofore raised or passed on, and, further, issues that have no basis in fact or in law since the

5. As stated in the application, the "right to strike and to picket in an effort to persuade or induce other working men to sympathize with their cause and join in bringing economic pressure on the employer."

injunctive decree of the lower court (affirmed on appeal), of necessity, dealt with the conditions existing at the time of the application therefor. It was not intended to and did not in fact give relief except as to the conditions as they existed then, that is, to prevent work stoppage at the sugar factories and refineries during the harvest season of 1953, which season ended, according to the record, either late in December of 1953 or early in January of 1954. The injunction was never intended to and did not in fact extend beyond that crucial period, as the opinion will reflect.

The application for rehearing is denied.