FOURNET, Chief Justice.
The United Mine Workers of America, District 50, and twelve other named defendants [1] are appealing devolutively from the judgments of the lower court granting to the 'plaintiff, Arkansas Oak Flooring Company, a preliminary and permanent injunction[2] restraining them “and any and all other persons acting for or on” their behalf “from picketing on, near or about plaintiff’s property * * * just off Texas Avenue in the City of Alexandria, Rapides Parish, Louisiana.”
The facts pertinent to a decision of the issues raised in this case are, substantially, that the Arkansas Oak Flooring Company (admittedly engaged in interstate commerce), with principal offices in Pine Bluff, Arkansas, operates a sawmill and flooring plant near the City of Alexandria, Louisiana, where it is engaged in the business, of manufacturing lumber and oak flooring. The employees in this plant had been unorganized for a period of some four years and there was no dispute between the employer and employees with respect to working conditions, wages, or hours, when, in October or November of 1953, James L. Ledbetter, claiming to represent the United Mine Workers of America, District 50 — a Union that has admittedly failed and refused to comply with the requirements of Section 9(f), (g) and (h) of the Labor *1116 Management Relations Act of 1947 [3] — arrived in Alexandria for the exclusive purpose of contacting the plaintiff’s employees, with the avowed intention of ultimately compelling recognition of this Union as the bargaining representative of such workers. Purportedly having authority from some 174 of the plaintiff’s 225 employees, exclusive of officers, inspectors, and foremen, who had allegedly joined the Union, Ledbetter, on February 23, 1954, at a time when he knew the plapt manager was out of the state, presented his demand for recognition of the Union to the assistant manager, who advised Ledbetter that inasmuch as the Union was not recognized by the National Labor Relations Board, he would not recognize it, and further advised that if Ledbetter desired to negotiate further he would have to take the matter up with the . company officials -in Pine Bluff, where all matters of policy were handled. Instead, a strike was called to.compel recognition of the Union on March 1, 1954, and the picket line thrown up in connection therewith caused a large number of the plaintiff’s employees to refuse to cross the line and report for work, with the result that the employer’s operations were greatly curtailed and irreparable loss was sustained.
The company thereupon secured a temporary restraining order with a rule to show cause why a preliminary injunction should not issue, and, ultimately, a permanent injunction be granted. On the return day, the Union excepted to its citation through Ledbetter, contending that as an unincorporated labor organization with no corporate existence in Louisiana it could not be impleaded into court under its group or company name; further, that the court had no jurisdiction rations; personae since Ledbetter was not authorized to receive process for the members of the group or to stand in judgment for the Union. On this same day, all defendants excepted to the petition on the ground of vagueness, and also to the court’s jurisdiction rationae materia, the latter exception being predicated on the assertion that the National Labor Relations Board alone has jurisdiction to halt the peaceful picketing of an employer whose business is affected by interstate commerce. In answer, all defendants generally denied the allegations of the petition, reiterated the matters set out in the exceptions, and asserted, additionally, that the right to strike and to picket peacefully as an expression of free discussion is protected by the First and Fourteenth Amendments to the Constitution of the United States, and Section 3 of Article I of the LSA-Constitution of Louisiana.'
*1118 The exceptions were overruled and the preliminary injunction granted, which, following trial on the .merits, was made permanent. -These appeals followed.
Counsel for the defendants is contesting here, under specifications of error set out in brief, the correctness of the trial judge’s ruling with respect (1) to the citation of the Union in its association name and through Ledbetter, (2) the state’s assumption of jurisdiction rationse materise despite the fact the plaintiff is engaged in interstate ■commerce and an unfair labor practice is involved, and (3) in any event, the right of a state court, under Louisiana law, to ■enjoin peaceful picketing of an employer’s plant to secure recognition as the employee bargaining representative.
The contention of the appellants that the court had no jurisdiction of the Union rationse personse since Ledbetter was without authority to receive process of citation for the group or to stand in judgment is based upon the generally recognized rule that obtains in the common law that in the absence of an enabling or permissive statute an unincorporated voluntary association is not capable of being sued in its common or association name. But this rule is untenable •in Louisiana under the express provisions ■of the LSA-Revised Statutes in this state which provide that “Any voluntary association may be sued on any obligation incurred for the benefit of such association, in the name of the said association and all legal services in such matters shall be made upon the managing official of such voluntary association and in the absence of such official, then upon any other official, and in the absence of all officials, then upon any member of such association.”[4] The fact that Ledbetter was not authorized to accept citation in the instant case is, therefore, of no moment.
As pointed out in the recent case of Godchaux Sugars, Inc., v. Chaisson, 227 La. 146, 78 So.2d 673, 680, “To hold that an unincorporated group must be individually named and' cited before it is susceptible to restraint would be equivalent to holding that, by subterfuge of unincorporation, group action transcends individual rights and is unlimited and unrestrictable except within the purview of the criminal statute, or that corporations unauthorized by law cannot be restrained from doing irreparable injury except through the process of individual identification.” The reason given therefor is that “ ‘time is of the essence in the nature of the relief prayed for in this case (and) to require the ascertainment of individual membership of an unincorporated association and thereafter individual citation as conditions precedent to the granting of relief, — and thereby require plaintiffs to gather information almost exclusively within the knowledge of defendants, without whose help it would be impracticable or perhaps even impossible to gather, *1120 and from whom hindrance and obstruction, rather than cooperation, could be reasonably anticipated, — would be tantamount to a denial of relief.’ ”
The second, and most important, error allegedly committed by the trial judge, that is, his failure to sustain the plea to the jurisdiction rational materia, is predicated upon the theory that this case involves an unfair labor practice in a dispute affecting interstate commerce and is, therefore, controlled by the landmark decision in Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 164, 98 L.Ed. 228, holding that such matters are within the exclusive jurisdiction bf- the National Labor Relations Board.
In the Garner case the Supreme Court of the United States simply gave added emphasis to the well settled jurisprudence that congressional legislation curtails state action in the field intended to be covered and that state action is, within that particular sphere, superseded; consequently, that Congress, by the adoption of the National Labor Relations Act of 1935 (referred to as the Wagner Act), and its amendment in 1947 by the Labor Management Relations Act (known as the Taft-Hartley law), did, with relation to the rights there conferred, place within the jurisdiction of the National Labor Relations Board the enforcement of the rights and privileges there delineated, which enforcement was to be carried out through the administrative scheme therein devised, as supplemented by the judicial remedies prescribed. The court was careful to point out, however, that the Act “leaves much to the states, though Congress has refrained from telling us how much”, leaving it to the judiciary to “spell out from conflicting indications of congressional will the area in which state action is still permissible”, and that the Board has no jurisdiction in those zones that are either “ ‘governable by the state or * * * entirely ungoverned.’ ” As to these spheres, the court has declined to find an implied exclusion of state power and, instead, permits the states to exercise their “ ‘historic powers over such traditionally local matters’ ” as injurious conduct which the Board is without express power to prevent, public safety and order and the use of streets and highways, as well as in those cases where the Board “would decline to exercise its powers once its jurisdiction was invoked.”
However, the labor activity sought to be restrained in the Garner case was peaceful stranger picketing for the purpose of coercing the employer to compel his employees to join a union — an activity, as demonstrated in the opinion, specifically denounced as an unfair labor practice in the Act. In the instant case the picketing was engaged in for the sole purpose of compelling the employer to recognize as the legally constituted agent of its employees a union that has no legal status before the National Labor Relations Board because of its failure and refusal to comply with the provisions of the Act requiring *1122 the filing of certain information relative to structural and financial matters, as well as non-communist oaths. This is clearly not an act denounced as an unfair labor practice by the amendment of 1947.
Congress, in order to promote the peaceful settlement of labor disputes, in so far as they obstruct the free flow of commerce through strikes and other forms of industrial unrest, adopted the Act of 1935, and, in 1947, in order to adjust and minimize any differences in the rights granted to unions, employees, and/or employers, amended that act by the adoption of the Labor Management Relations Act.
In Section 9 of this amendment, Congress has, in no uncertain terms, specifically devised the formal mode for the selection and rejection of agents or representatives. Paragraph (a) of the section provides that “Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.” Under this same section, an employer, if in doubt as to the majority claimed by a unit, can petition the Board for certification of the legally constituted representative, whether one or more unions claim to be the bargaining agent of the employees as defined in Section 9(a) [Section 9(c) (1) (B)], and this certification can only be granted follozving an election by secret ballot conducted by the Board in accordance zvith its mies as promulgated in conformity zvith the provisions set out in the Act. Section 9(c) (1). The Board is, therefore, the only administrative agency' with authority to certify the proper bargaining agent in a business affected by interstate commerce. It is, additionally, the only agency that has the machinery for conducting the elections that determine that question.
Newman, in his work on “The Law of Labor Relations,” gives us the following excellent analysis of the historical background of these provisions, as well as their effect:
“The problem of whether a union is the proper bargaining representative of the group of employees for whom the union purports to speak arises when the union asserts that it constitutes the representative body with which the employer is obliged to bargain. If it is, it may bargain for the entire group, by virtue of the cardinal principle that the representatives selected by the majority of the employees shall be the exclusive representatives of all the employees. Under the Wagner Act of 1935 there was no way for the employer to test the validity of the un *1124 ion!s claim by obtaining a ruling of the Board on,'the authenticity of the signature cards, possible withdrawals of authorizations for the union to represent the individual employees, or the absence of coercion by the union organizers against the employees to induce them to sign the authorization. There was no provision for a certification by the Board of the bargaining representative at the request of the employer, although a union might obtain such certification on its request. Under'the Wagner Act the employer had to decide for himself, therefore, the difficult questions of fact as to the validity of the proof that the union really was the' choice of a majority of the employees * * *. The employer therefore faced the dilemma of refusing to recognize and bargain with the union at the peril that the unit might later be found by the Board to be the proper representative of the employee group, or of dealing with the union at the hazard of finding that a different rep-, resentative was entitled to recognition. This hardship on the employer was so evident that after a few years of operation under the Wagner Act the Board . promulgated an administrative ruling to the effect that where two groups asserted the right to represent the. employees, the employer might demand. an election under the direction of the Board before he was obliged to recognize either group. There zuas still no relief when only a single group demanded recognition,. This evil has now benn fully corrected in the Act of 1947, where by the provisions of section 9(c) (1) (B) the employer may petition for an election where cmy claim for representation is made upon him. The employer is therefore relieved from the hazard of recognizing an uncertified urn-ion which is not in fact entitled to recognition, and from the hazard of denying recognition to an uncertified union which actually is validly authorized to represent an appropriate unit * * Pages 13 and 14. (Emphasis supplied.)
However, in Section 9 Congress also precluded investigation by the Board of any question concerning the representation of employees raised by a labor organization, as well as the issuance of any complaint with respect to an unfair labor practice at the behest of a labor organization until that organization had complied with the provisions of subsection (f) with respect to the filing of detailed information relative to the Union’s organizational structure. Additionally, and in furtherance of “its policy of wholly eradicating and barring from leadership in the American labor movement, at each and every level, adherents to the Communist party and believers in the unconstitutional overthrow of our *1126 Government”,[5] Congress adopted Section 9(h) which provides that “No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organisation under subsection (c) of this section,[6] and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10,[7] unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organisation and the officers of any national or international labor organisation of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organisation that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods.” (Emphasis supplied.)
Accordingly, there is, in the record, a letter addressed to the attorneys representing the plaintiff by the .regional director of the National Labor Relations Board in which it is stated: “This is to advise that the United Mine Workers of America has not complied with the filing requirements of Section 9(f), (g) and (h) of the Act and therefore may not use the services of the Board for either representation or unfair labor practice matters.” ■
Counsel for the defendants conceded during the trial that this Union is non-complying, but argues in brief that “the significance of this means only that the defendant Union cannot use the facilities of the Labor Board to the extent that such are available to complying unions,” contending, very ingenuously, that such non-compliance does not render the union an “outlaw,” but simply strips it of its right to appeal to the Board for the settlement of matters of representation and unfair labor practices. He insists, therefore, that inasmuch as the employer is not denied the facilities of the board, it has a duty to negotiate with the union chosen by the majority of its employees and to itself invoke the facilities of the board for the settlement of any grievances it may have with respect thereto.
Counsel is in error in his appreciation of the significance of these provisions. Shortly after the passage of the 1947 amendment to the Act, in the matter of *1128 Herman Loewenstein, Inc., 75 N.L.R.B. 377, the National Labor Relations Board had occasion to consider and interpret the provisions of Section 9(f), (g) and (h) and it there laid down a policy from which it has never since deviated. Although in that case the matter had been brought to the Board by the employer, the Board, in refusing to take jurisdiction, said:
“We construe the amended Act to provide, in essence, that a non-complying labor organization shall not be the beneficiary of any Board investigation ■of a question concerning representation. For this reason the Board has declined to proceed to hearing or election on a petition filed by a non-complying union; it has declined to certify such a union since the effective date of the amendments to the Act, even though it won a victory at the polls before that date; it has declined to place such a union on the ballot, as intervenor, in an election held at the instance of a petitioning labor organization that has complied with Section 9(f) and (h), even though its intervention at the hearing was otherwise proper; and it has declined to order an employer to bargain collectively with a non-complying union, except upon compliance by the union within a specified period.
“Here the petitioner is not a complying labor organization, but the employer. The fact remains that the question concerning representation, although brought to the Board’s attention by the employer’s own petition, was ‘raised by a labor organization.’ It was raised by the affirmative claim, here made both by the Fur Workers, CIO and by the Adirondack Workers, that a labor organization represented a majority of the employer’s employees within an appropriate unit. * * * Although it is the employer’s petition in such a case that sets the Board’s machinery in motion, it is an individual’s or a labor organization’s initial claim for recognition that makes it possible for the employer to invoke that machinery. If, as here, a labor organization that presented a claim for recognition has not complied with the provisions of Section 9(f) and (h), we would no more implement the policy of Congress if we placed it on the ballot than if we were to do so in a case in which it, or another labor organization, filed the formal papers with the Board. If a non-complying union were placed on the ballot and happened to win the election, no one could expect the Board under the amended Act to issue a certification that would run in its favor. But a victory at the polls, even without later formal certification, would confer certain moral and practical advantages on the non-complying union which the basic policy of Congress appears to discountenance. Such a result can be averted with certainty *1130 only by our declining to place a noncomplying union on any ballot, unless there are absolutely compelling statutory or policy reasons for doing so.
“In our opinion, the fact that a petition has been filed by an employer rather than by a labor organisation does not provide such compelling reasons. The question concerning representation remains a question ‘raised by a labor organization’ which has made a ■claim for recognition as bargaining representative. An employer petition, like a union petition, seeks to resolve the question of who, if anyone, is the true bargaining representative of the employees. Either sets in motion the same investigative process; the same Tesult, either of certification or of dismissal, may flow from either; and a Board election conducted on the basis ■of either will now preclude another Board election for 12 months. This similarity between employer and union petitions, both in purpose and in result, points strongly to the conclusion that a non-complying union should derive no more advantage from the one than it does from the other. The statutory language supports the same conclusion. Section 9(f) and (h) speak in terms -of questions raised, rather than of petitions filed, by labor organizations. An employer petition must allege that he has been presented with a claim by an individual or a labor organization for recognition as bargaining representative of his employees. The distinction which Congress intended to draw by the words ‘raised by a labor organization’ is, we believe, between a claim for recognition made by a union and a similar claim by an individual or individuals, not between a union petition and an employer petition filed with the board. * * *
“ * * * We believe * * * that the exclusion of non-complying unions from the ballot in cases where employers are the petitioners is more nearly consistent with the supervening policy of denying the imprimatur of Government to such labor organisations.” To this same effect are the later decisions in Staten Island Cleaners, Inc., 93 N.L.R.B. 63; and The Federal Refractories Corp., 100 N.L. R.B. 35. (All emphasis has been supplied.)
The Act permits individual employees, as well as the employer, to petition the Board with respect to questions concerning representation and unfair labor practices, but the United States Court of Appeal for the Fifth Circuit, in N. L. R. B. v. Happ Brothers Co., 196 F.2d 195, 197, held it would not permit individual employees, bringing charges of unfair labor practices against an employer, to thus “front” for a non-complying union that was without access to the board’s facilities. It accordingly refused to enforce the Board’s directive to the em *1132 ployer, br.ought at the instance of an employee, ordering it to cease and desist from the unfair labor practices there charged, stating it would not thus permit the great purpose of the amendment requiring the filing of non-communist oaths to be “rendered nugatory and destroyed” by the subterfuge of or resort to the simple expedient of employing an individual to “front” for non-complying unions.[8]
In National Labor Relations Board v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 761, 95 L.Ed. 969, the Supreme Court of the United States, holding that the Board was without authority to order an employer to bargain with a local union whose affiliate or parent union had not filed the requisite noncommunist affidavits provided for in the Act, said: “The Board is a statutory agency, and, when it is forbidden to investigate or entertain complaints in certain circumstances, its final order could hardly be validSee, additionally, the annotations at 95 L.Ed. 979 and 97 L. Ed. 415. (Emphasis supplied.)
It necessarily follows that inasmuch as the Union in the instant case has, by its own admission and as certified to by the National Labor Relations Board, failed and refused to comply with the provisions of Section 9(f), (g) and (h) of the 1947 amendment, the Board is without jurisdiction to entertain any question with respect to its protestations of majority representation and/or unfair labor practices, for it is not only ineligible for certification, but cannot compel the employer to recognize it as the representative of its employees. The plaintiff’s refusal to recognize the Union was, therefore, not in violation of any obligation imposed by law, and the picketing in furtherance of this unlawful objective was the employment of economic pressure illegally for the purpose of causing the employer irreparable injury for which it has no adequate administrative or legal remedy — injurious conduct which the state has jurisdiction to relieve. See, Stewart-Warner Corp. v. National Labor Relations Board, 4 Cir., 194 F.2d 207, 210;[9] Good- *1134 wins, Inc. v. Hagedorn, 303 N.Y. 300, 101 N.E.2d 697, 32 A.L.R.2d 1019; Fulford v. Smith Cabinet Mfg. Co., 118 Ind.App. 326, 77 N.E.2d 755; Cordey China Co. v. United Mine Workers of America, 25 N.J.Super. 514, 96 A.2d 696; and Simmons v. Retail Clerks Union Local 770, 14 Labor Cases 73,335.
Counsel for appellants, with respect to the third specification of error urged, concedes in brief that since the trial of this case on the merits the Douglas Public Service [Douglas Public Service Corp. v. Gaspard, 225 La. 972, 74 So.2d 182, 187], and Godchaux Sugars, Inc., cases have been decided adversely to his contention that the state is without right under Louisiana law to enjoin peaceful picketing, but he contends that in so holding we violated a cardinal rule of constitutional construction in that we invalidated the state’s anti-injunction statute although such conclusion was unnecessary inasmuch as we found violence -occurred during the course of both of these labor controversies.
. Counsel is in error in this statement, for we declared in the Douglas Public Service case (approved in the Godchaux case) in clear and unequivocal language that “ * * * any act of the legislature, whether procedural or substantive, that infringes 'or trenches upon the constitutional prerogatives of the courts, cannot stand”; consequently, that the .“provisions of the so-called anti-injunction act that seek to limit the jurisdiction of the district courts of this state in granting of immediate relief, if that is necessary for the protection of rights and property, are 'illegal and ineffective.” It necessarily follows that the doors of the courts of this state cannot be closed to the plaintiff here upon the showing made that irreparable injury was being suffered by it as a consequence of the unlawful activities of the defendants.
The final contention — that the restraint of the picketing in this case is an infringement of the freedom of speech guarantees of the Federal and state constitutions — is also untenable inasmuch as we have found as a fact that the picketing here engaged in is -for an unlawful objective. Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 94 L. Ed. 985; International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local 309 v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; Building Service Employers International Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Richman Brothers Co. v. Amalgamated Clothing Workers, Ohio Com.Pl., 116 N.E.2d 60, (this holding was approved by the United States Supreme Court on April 4, 1955 when the Federal Case—6 Cir., 211 F.2d 449 — was approved by that court) ; W. E. Anderson Sons Co. v. Local Union No. 311, 156 Ohio St. 541, 104 N.E.2d 22; as well as Cordey China Co. v. United Mine Workers of America, 25 N.J.Super. 514, 96 A.2d 696, and the authorities therein cited.
*1136 In disposing of this issue adversely to the contention of the defendants in the recent decision in Godchaux Sugars, Inc., supra, we observed [227 La. 146, 78 So.2d 680] :
“It is true that the United States Supreme Court has likened picketing to speech, but this sweeping analogy as first enunciated in Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, has since been greatly refined and restricted. In Hughes v. Superior Court of .State of California, 339 U.S. 460, 70 S.Ct. 718, 721, 94 L. Ed. 985, the United States Supreme Court * * * said: ‘ “(T)he domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states,” * * * no doubt induces liberty of thought and appropriate means for expressing it. But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing “is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.” * * * Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. * * * However general or loose the language of opinions, the specific situations have controlled decision. It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * “a state is not required to tolerate in all places and all circumstances even peaceful picketing t- ‡ t- ” ’ ”
Furthermore, the right to speak freely, as guaranteed by the constitution, is the right to speak for one’s self or as the duly authorized agent of another.
For the reasons assigned, the judgments appealed from are affirmed, at the cost of the appellants.
HAMITER, J., concurs in the decree.

. James L. Ledbetter, Richard Vidrine, Lewis Dunn, Foster'Joseph', Leonard Fuller, David Fox, Henry Fowler, Will Sullivan, ■ Mack Kelley, ■ Eddie Goff, Will Gobb, and John Doggins.

. No. 41,797 on the docket of the court is the appeal -taken from the judgment granting the preliminary injunction, and No. 41,983- is the appeal taken -from the judgment granting the permanent injunction; - -

. Section 9(f) and (g) require that a Union seeking to be declared the bargaining agent of employees file with the Secretary of Labor certain information relative-to its organizational and financial structure, and Section 9(h) requires the filing of affidavits with the National Labor Relations Board in which the Union’s officers deny membership in or affiliation with the Communist Party and deny belief in the overthrow of the United States government by force.

. Act 170 of 1918, which has been ilicor- ' ■ porated into the LSA-Revised Statutes of 1950 as Paragraph 22- of LSA-R.S. • 13:3471.' ’ ' " -

.N. L. R. B. v. Happ Bros. Co., 5 Cir., 196 E.2d 195, 197. See, also, American Communications Ass’n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925, and particularly the concurring opinion of Justice Jackson at 339 U.S. 422, 70 S.Ct. 696, 94 L.Ed. 956.

. Authorizing the Board to investigate a question of representation upon the petition of the employer, employee, or labor organization, as above described in the petition.

. Authorizing the investigation through the procedure set out in Section 10(b) the unfair labor practices as listed in Section 8.

. The picketing in the instant case is tantamount to organized activity engaged in for the purpose of compelling the employer to “front” for the Union in a representation matter before the Board.

. In this case officials of a non-complying union, acting in their individual capacities, sought to charge the employer with an unfair labor practice because of the employer’s refusal to permit the circulation of petitions on its property in connection with an attempt to organize the employees. In concluding such conduct did not constitute an unfair labor practice by the employer, the- United States Court of Appeal for the Fourth Circuit said: “There is nothing in the Labor Management Relations Act which requires an employer to permit his premises to be used by employees for activities in contravention of the spirit and purpose of the act. The company was under no obligation to recognize or deal with the (non-complying Union) even if it had obtained a majority and, a fortiori, was under no obligation to permit adherents of the (Union) to use its premises * * in carrying on a campaign in behalf of the (Union).” (Parentheses added.)