### HUGHES et al v. SUPERIOR COURT OF CALIFORNIA in and for COUNTY OF CONTRA COSTA.

United States Supreme Court.

No. 61.   Decided May 8, 1950.

Bertram Edises, Oakland, Cal., for petitioner.
Frank S. Richards, San Francisco, Cal., for respondents.

## OPINION

Mr. JUSTICE FRANKFURTER delivered the opinion of the
Court.

Does the Fourteenth Amendment of the Constitution bar a
State from use of the injunction to prohibit picketing of a
place of business solely in order to secure compliance with a
demand that its employees be in proportion to the racial
origin of its then customers? Such is the broad question of
this case.

The petitioners, acting on behalf of a group calling them-
selves Progressive Citizens of America, demanded of Lucky
Stores, Inc., that it hire Negroes at its grocery store near the
Canal Housing Project in Richmond, California, as white
clerks quit or were transferred, until the proportion of Negro
clerks to white clerks approximated the proportion of Negro
to white customers. At the time in controversy about 50%
of the customers of the Canal store were Negroes. Upon refusal
of this demand and in order to compel compliance, the Canal
store was systematically patrolled by pickets carrying placards
stating that Lucky refused to hire Negro clerks in proportion
to Negro customers.

Suit was begun by Lucky to enjoin the picketing on appro-
priate allegations for equitable relief. The Superior Court
of Contra Costa County issued a preliminary injunction re-
straining petitioners and others from picketing any of Lucky's
stores to compel "the selective hiring of negro clerks, such
hiring to be based on the proportion of white and negro cus-
tomers who patronize plaintiff's stores." In the face of this
injunction, petitioners continued to picket the Canal store,
carrying placards reading: "Lucky Won't Hire Negro Clerks
in Proportion to Negro Trade—Don't Patronize." In con-
formity with State procedure, petitioners were found guilty
of contempt for "wilfully disregarding" the injunction and
were sentenced to imprisonment for two days and fined $20
each. They defended their conduct by challenging the in-

junction as a deprivation of the liberty assured them by the Due Process Clause of the Fourteenth Amendment. The intermediate appellate court annulled the judgment of contempt, Cal. App., 186 P. 2d 756, but it was reinstated on review by the Supreme Court of California. That court held that the conceded purpose of the picketing in this case—to compel the hiring of Negroes in proportion to Negro customers—was unlawful even though pursued in a peaceful manner. Having violated a valid injunction petitioners were properly punishable for contempt. "The controlling points," according to the decision of the Supreme Court of California, "are that the injunction is limited to prohibiting picketing for a specific unlawful purpose and that the evidence justified the trial court in finding that such narrow prohibition was deliberately violated." 32 Cal. 2d 850, 856, 198 P. 2d 885, 888. We brought the case here to consider claims of infringement of the right of freedom of speech as guaranteed by the Due Process Clause of the Fourteenth Amendment. 336 U. S. 966, 69 S. Ct. 930.

**First.** Discrimination against Negroes in employment has brought a variety of legal issues before this Court in recent years. Graham v. Brotherhood of Locomotive Firemen and Enginemen, 338 U. S. 232, 70 S. Ct. 14; Railway Mail Ass'n v. Corsi, 326 U. S. 88, 65 S. Ct. 1483, 89 L. Ed. 2072; Steele v. Louisville & N. R. Co., 323 U. S. 192, 65 S. Ct. 226, 89 L. Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U. S. 210, 65 S. Ct. 235, 89 L. Ed. 187; New Negro Alliance v. Sanitary Grocery Co., 303 U. S. 552, 304 U. S. 542, 58 S. Ct. 703, 82 L. Ed. 1012. See also Myrdal, An American Dilemma cc. 13-14 (1944). Such discrimination raises sociological problems which in some aspects and within limits have received legal solutions. California has been sensitive to these problems and decisions of its Supreme Court have been hostile to discrimination on the basis of color. James v. Marinship Corp., 25 Cal. 2d 721, 155 P. 2d 329, 160 A. L. R. 900; Williams v. International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America, 27 Cal. 2d 586, 165 P. 2d 903. This background of California's legal policy is relevant to the conviction of its court that it would encourage discriminatory hiring to give constitutional protection to petitioners' efforts to subject the opportunity of getting a job to a quota system. The view of that court is best expressed in its own words:

"It was just such a situation—an arbitrary discrimination upon the basis of race and color alone, rather than a choice based solely upon individual qualification for the work to

be done—which we condemned in the Marinship case, supra, (25 Cal. 2d 721, 737, 745, 155 P. 2d 329). The fact that those seeking such discrimination do not demand that it be practiced as to all employes of a particular employer diminishes in no respect the unlawfulness of their purpose; they would, to the extent of the fixed proportion, make the right to work for Lucky dependent not on fitness for the work nor on an equal right of all, regardless of race, to compete in an open market, but rather, on membership in a particular race. If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis. Yet that is precisely the type of discrimination to which petitioners avowedly object." 32 Cal. 2d at 856, 198 P. 2d at 889.

These considerations are most pertinent in regard to a population made up of so many diverse groups as ours. To deny to California the right to ban picketing in the circumstances of this case would mean that there could be no prohibition of the pressure of picketing to secure proportional employment on ancestral grounds of Hungarians in Cleveland, of Poles in Buffalo, of Germans in Milwaukee, of Portuguese in New Bedford, of Mexicans in San Antonio, of the numerous minority groups in New York, and so on through the whole gamut of racial and religious concentrations in various cities. States may well believe that such constitutional sheltering would inevitably encourage use of picketing to compel employment on the basis of racial discrimination. In disallowing such picketing States may act under the belief that otherwise community tensions and conflicts would be exacerbated. The differences in cultural traditions instead of adding flavor and variety to our common citizenry might well be hardened into hostilities by leave of law. The Constitution does not demand that the element of communication in picketing prevail over the mischief furthered by its use in these situations.

**Second.** "[T]he domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states," Palko v. State of Connecticut, 302 U. S. 319, 327, 58 S. Ct. 149, 153, 82 L. Ed. 288, no doubt includes liberty of thought and appropriate means for expressing it. But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing "is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." Mr. Justice Douglas, joined

by Black and Murphy, JJ., concurring in Bakery & Pastry Drivers & Helpers Local 802 of International Brotherhood of Teamsters v. Wohl, 315 U. S. 769, 775, 776, 62 S. Ct. 816, 819, 86 L. Ed. 1178. Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. See Gregory, Labor and the Law 346-48 (rev. ed. 1949); Teller, Picketing and Free Speech, 56 Harv. L. Rev. 180, 200-02 (1942); Dodd, Picketing and Free Speech: A Dissent, 56 Harv. L. Rev. 513, 517 (1943); Hellerstein, Picketing Legislation and the Courts, 10 N. C. L. Rev. 158, 186-87, n. 135 (1932).

**Third.** A State may constitutionally permit picketing despite the ingredients in it that differentiate it from speech in its ordinary context. Senn v. Tile Layers Protective Union, 301 U. S. 468, 57 S. Ct. 857, 81 L. Ed. 1229. And we have found that because of its element of communication picketing under some circumstances finds sanction in the Fourteenth Amendment. Thornhill v. State of Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; American Federation of Labor v. Swing, 312 U. S. 321, 61 S. Ct. 568, 85 L. Ed. 855; Bakery & Pastry Drivers & Helpers Local 802 of International Brotherhood of Teamsters v. Wohl, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178; Cafeteria Employees Union v. Angelos, 320 U. S. 293, 64 S. Ct. 126, 88 L. Ed. 58. However general or loose the language of opinions, the specific situations have controlled decision. It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. See Dorchy v. State of Kansas, 272 U. S. 306, 47 S. Ct. 86, 71 L. Ed. 248; Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc., 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200; Hotel and Restaurant Employees' International Alliance, Local No. 122 v. Wisconsin Employment Relations Board, 315 U. S. 437, 62 S. Ct. 706, 86 L. Ed. 946; Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed. 1143; Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 69 S. Ct. 684. "A state is not required to tolerate in all places and all circumstances even

peaceful picketing by an individual." Bakery & Pastry Drivers & Helpers Local 802 of International Brotherhood of Teamsters v. Wohl, supra, 315 U. S. at page 775, 62 S. Ct. at page 819, 86 L. Ed. 1178.

The constitutional boundary line between the competing interests of society involved in the use of picketing cannot be established by general phrases. Picketing when not in numbers that of themselves carry a threat of violence may be a lawful means to a lawful end. See American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 206-207, 42 S. Ct. 72, 77, 66 L. Ed. 189, 27 A. L. R. 360. The California Supreme Court suggested a distinction between picketing to promote discrimination, as here, and picketing against discrimination: "It may be assumed for the purposes of this decision, without deciding, that if such discrimination exists, picketing to protest it would not be for an unlawful objective." 32 Cal. 2d at 855, 198 P. 2d at 888. We cannot construe the Due Process Clause as precluding California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would subvert such policy. See Giboney v. Empire Storage & Ice Co., supra.

**Fourth.** The fact that California's policy is expressed by the judicial organ of the State rather than by the legislature we have repeatedly ruled to be immaterial.[1] Castillo v. McConnico, 168 U. S. 674, 684, 18 S. Ct. 229, 233, 42 L. Ed. 622; Herbert v. State of Louisiana, 272 U. S. 312, 316, 47 S. Ct. 103, 104, 71 L. Ed. 270, 48 A. L. R. 1102; Nashville, C. & St. L. R. Co. v. Browning, 310 U. S. 362, 369, 60 S. Ct. 968, 972, 84 L. Ed. 1254; Skiriotes v. State of Florida, 313 U. S. 69, 79, 61 S. Ct. 924, 930, 85 L. Ed. 1193; Snowden v. Hughes, 321 U. S. 1, 11, 64 S. Ct. 397, 402, 88 L. Ed. 497. For the Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches. Dreyer v. People of State of Illinois, 187 U. S. 71, 83-84, 23 S. Ct. 28, 32, 47 L. Ed. 79; Soliah v. Heskin, 222 U. S. 522, 524, 32 S. Ct. 103, 56 L. Ed. 294; Erie R. Co. v. Board of Public Util. Com'rs, 254 U. S. 394, 413, 41 S. Ct. 169, 172, 65 L. Ed. 322; Prentis v. Atlantic Coast Line R. Co., 211 U. S. 210, 225, 29 S. Ct. 67, 69, 53 L. Ed. 150; Keller v. Potomac Elec. Power Co., 261 U. S. 428, 443,

---

1. The range of policy in proscribing or permitting picketing for various ends is illustrated by a recent bill against picketing of courts passed by the New York State Legislature but vetoed by Governor Dewey. See N. Y. Times, Apr. 11, 1950, p. 21, Col. 1.

43 S. Ct. 445, 448, 67 L. Ed. 731. "[R]ights under that amendment turn on the power of the state, no matter by what organ it acts." State of Missouri v. Dockery, 191 U. S. 165, 170-171, 24 S. Ct. 53, 54, 48 L. Ed. 133, 63 L. R. A. 571.

It is not for this Court to deny to a State the rights, or even to question the desirability, of fitting its law "to a concrete situation through the authority given * * * to its courts." Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc., supra, 312 U. S. at page 297, 61 S. Ct. at page 557, 85 L. Ed. 836, 132 A. L. R. 1200. It is particularly important to bear this in mind in regard to matters affecting industrial relations which, until recently, have "been left largely to judicial lawmaking and not to legislation." Carpenters & Joiners Union of America, Local No. 213, v. Ritter's Cafe, supra, 315 U. S. at page 724, 62 S. Ct. at page 808, 86 L. Ed. 1143. In charging its courts with evolving law instead of formulating policy by statute, California has availed itself of the variety of law-making sources, and has recognized that in our day as in Coke's "the law hath provided several weapons of remedy." Coke, The Compleat Copyholder §9 in Three Law Tracts (1764). California chose to strike at the discrimination inherent in the quota system by means of the equitable remedy of injunction to protect against unwilling submission to such a system. It is not for this Court to deny to California that choice from among all "the various weapons in the armory of the law." Tigner v. State of Texas, 310 U. S. 141, 148, 60 S. Ct. 879, 882, 84 L. Ed. 1124, 130 A. L. R. 1321.

The policy of a State may rely for the common good on the free play of conflicting interests and leave conduct unregulated. Contrariwise, a State may deem it wiser policy to regulate. Regulation may take the form of legislation, e. g., restraint of trade statutes, or be left to the ad hoc judicial process, e. g., common law mode of dealing with restraint of trade. Either method may outlaw an end not in the public interest or merely address itself to the obvious means toward such end. The form the regulation should take and its scope are surely matters of policy and, as such, within a State's choice.

If because of the compulsive features inherent in picketing, beyond the aspect of mere communication as an appeal to reason, a State chooses to enjoin picketing to secure submission to a demand for employment proportional to the racial origin of the then customers of a business, it need not forbid the employer to adopt such a quota system of his own free will. A State is not required to exercise its intervention on the basis of abstract reasoning. The Constitution

commands neither logical symmetry nor exhaustion of a principle. "The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific." Metropolis Theatre Co. v. Chicago, 228 U. S. 61, 69-70, 33 S. Ct. 441, 443, 57 .L. Ed. 730. A State may "direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed." Central Lumber Co. v. State of South Dakota, 226 U. S. 157, 160, 33 S. Ct. 66, 67, 57 L. Ed. 164. See also Lindsley v. National Carbonic Gas Co., 220 U. S. 61, 81, 31 S. Ct. 337, 341, 55 L. Ed. 369, Ann. Cas. 1916C, 160; Keokee Consolidated Coke Co. v. Taylor, 234 U. S. 224, 227, 34 S. Ct. 856, 58 L. Ed. 1288; Miller v. Wilson, 236 U. S. 373, 384, 35 S. Ct. 342, 344, 59 L. Ed. 628, L. R. A. 1915F, 829; Farmers & Merchants Bank of Monroe, N. C. v. Federal Reserve Bank, 262 U. S. 649, 661-662, 43 S. Ct. 651, 656, 67 L. Ed. 1157, 30 A. L. R. 635; James-Dickinson Farm Mortgage Co. v. Harry, 273 U. S. 119, 125, 47 S. Ct. 308, 310, 71 L. Ed. 569; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 46, 57 S. Ct. 615, 628, 81 L. Ed. 893, 108 A. L. R. 1352. Lawmaking is essentially empirical and tentative, and in adjudication as in legislation the Constitution does not forbid "cautious advance, step by step, and the distrust of generalities." Carroll v. Greenwich Insurance Co., 199 U. S. 401, 411, 26 S. Ct. 66, 67, 50 L. Ed. 246.

The injunction' here was drawn to meet what California deemed the evil of picketing to bring about proportional hiring. We do not go beyond the circumstances of the case. Generalizations are treacherous in the application of large constitutional concepts. Affirmed.

Mr. JUSTICE BLACK and Mr. JUSTICE MINTON are of the opinion that this case is controlled by the principles announced in Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 69 S. Ct. 684, and therefore concur in the Court's judgment.

Mr. JUSTICE REED, concurring.

I read the opinion of the Supreme Court of California to hold that the pickets sought from Lucky Stores, Inc., discrimination in favor of persons of the Negro race, a discrimination unlawful under California law. Such picketing may be

barred by a State, Giboney v. Empire Storage & Ice Co., 336. U. S. 490, 69 S. Ct. 684.

Mr. JUSTICE DOUGLAS took no part in the consideration or decision of this case.