BURGESS *v.* DANIEL PLUMBING & GAS CO., INC.

5-771                                    285 S. W. 2d 517

Opinion delivered January 9, 1956.

*P. H. Hardin,* for appellant.

*Harper, Harper & Young,* for appellee.

PAUL WARD, Associate Justice.    This appeal challenges the permanent order of the Chancery Court of Sebastian County, Fort Smith District, which restrained Local Union No. 29 of Fort Smith from picketing the place of business of the Daniel Plumbing & Gas Company, Inc., while it was engaged, as a sub-contractor, in installing plumbing and pipe fittings for a new factory building being erected in Fort Smith for the Eastern Metal Products Corporation.

On March 16, 1955 the Daniel Company filed a complaint containing, in substance, the following material allegations: The Daniel Company is a corporation duly organized and existing under the laws of this state with

its principal place of business at Beebe, Arkansas; The appellants are officers and representatives of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Local Union No. 29; On or about February 8, 1955 the Daniel Company was awarded the contract for the installation of the necessary plumbing in the factory building above mentioned; On March 10, 1955 one of appellants, W. C. Atwell, placed a picket at said building site and continues to picket said site; On said date the Daniel Company was employing both union and non-union employees, and there is and has been no dispute between the Daniel Company and any of its employees over wages, hours or working conditions; The Daniel Company has not refused to negotiate with the union and has not discriminated against organized labor or said union; Said picketing is unlawful and is intended to obtain a closed shop, either contractually or non-contractually, in violation of the constitution of this state, and is intended to coerce the Daniel Company into unlawful discrimination against its employees who are not members of said union; As a result of the picketing all union employees of the Daniel Company and other contractors engaged in erecting said factory building have ceased working, and; Unless said picketing is restrained the Daniel Company will suffer irreparable damage. The prayer was for a temporary restraining order.

After a temporary restraining order was issued on March 18, 1955, the union, on April 9, 1955, answered that said temporary restraining order denies to them their right of free speech as guaranteed by the Federal Constitution; and the issuance of a permanent restraining order would likewise deprive them of the right of free speech.

*The general factual background* out of which this controversy arises is, summarily stated, as follows: The Daniel Company is a corporation located at Beebe. Its president is John B. Thurman of Little Rock and its active manager or superintendent is E. B. Daniel who lives at Beebe. Merl Daniel, the 28 year old son of E. B. Dan-

iel, acts as superintendent on specific jobs. The Daniel Company obtained a contract from J. S. Davis & Sons who in turn had the general contract for building a new factory building for the Eastern Metal Products Corporation at Fort Smith. The latter part of February 1955 young Daniel, as field superintendent of the Daniel Company, went to Fort Smith for the purpose of installing the plumbing equipment in said building, and had unloaded some material at the construction site. He got the job under way about the first of March 1955 and soon thereafter employed a Mr. Rice who was a union plumber living in Fort Smith and one other non-union plumber who lived at Beebe. Young Daniel was himself a plumber and did manual labor on the job as such.

After Rice had been working on the job for two days an agent of the union, Mr. Atwell, came on the job and stated to young Daniel that he wanted to negotiate to have Rice's wages raised to the extent of $1.00 an hour. While Rice had been working he was paid at the rate of $2.75 per hour which was the prevailing union wage scale for plumbers in Fort Smith, and Rice had made no demand for a wage increase. When Young Daniel told Atwell that he had no authority to negotiate for wage raises, Atwell immediately left and Rice walked off the job promptly thereafter. About an hour and twenty minutes later Rice was back picketing Daniel's place of operation. As a result of this all union men working for appellee and the general contractor walked off the job.

Set out below is a summary of the pertinent testimony of the witnesses.

*Felix Vozel,* a witness for appellee, is an employee of the J. S. Davis & Sons Construction Company which has the general contract for erecting the building in question. I have been such employee for 17 years. The Daniel Company started assembling its material about the 23rd or 24th of February 1955 but had not at that time started work on the job. About that time I saw Mr. Atwell, an agent for Local 29, at the construction site and he asked me who had unloaded the materials for the Daniel Company, and I told him I did not know.

I asked him what he was going to do about it and he replied that they were going to close the job down for 90 days.

*Lee Davis* a witness for appellee. I have lived in Fort Smith for 50 years and am a member and senior partner of the J. S. Davis Lumber Company, Construction Division, and we have a contract to erect the factory building in question. Our contract amounting to approximately $400,000 was awarded last fall. I am a member of and a contributor to the Fort Smith Industrial Foundation which promoted the securing of the Eastern Metal plant for Fort Smith, and as such attended a meeting of the Foundation Committee at the Chamber of Commerce building the latter part of February 1955. This meeting was called at the request of Mr. Folsom and Mr. Atwell [members of Local 29]. Besides those men at this meeting there were presidents of three local banks, Mr. Frank Shaw [an attorney] and Mr. Jack Rose [attorney for the union], and possibly some others. When Mr. Folsom was asked to state the purpose of the meeting he objected to my having a lawyer and a stenographer present. Mr. Folsom was informed that I had as much right to have an attorney there as he and his friend had, but he refused to talk because the stenographer was there to take notes on the meeting. I finally agreed to dismiss the stenographer. He then stated that "they were there in the interest of securing the work for Fort Smith Men." Mr. Atwell stated that he wanted to see Fort Smith men get the work, and I said you mean union men and, he said no, I don't mean union men; Mr. Atwell made a sign (pointing with his thumb) and said "Well we will take care of him over there." I inferred that he was pointing to the court house since things have happened as they did and because all of the men Daniel brought in here were turned down on getting a license. Daniel had 11 men take the examination for license and all of them failed. Mr. Atwell is the business manager of Local 29 of the Plumbers and Steam Fitters Union. Mr. Daniel was not present at the meeting and had not come on the job at that time, and neither was any representative of the Daniel Company present. Under our

general contract we have been employing union common labor and paying the union scale of wages. When the picketing started all my union men quit work and walked out. As far as I know the Daniel Company was employing both union and non-union plumbers and common laborers. None of our union employees have returned to work since the picket line was established, and our work is down and has been down since the 10th of March. The Daniel Company's contract amounts to about 10% of the entire construction cost of the building.

*Merl Daniel,* field superintendent of the Daniel Company. I am 28 years old and live at Beebe, Arkansas and am a stockholder in the Daniel Plumbing and Gas Company, Inc. which is a corporation; my father is secretary and treasurer of the company and John B. Thurman of Little Rock is the president. I am the field superintendent for our corporation in charge of the work at Fort Smith, but I had nothing to do with negotiating the contract with the corporation which it has with Eastern Metal Products Company. I am a licensed plumber and I work as such on these jobs including the one at Fort Smith. I unloaded a car load of soil pipe on February 23, 1955 — just took one day, and it was about a week after that before I got started work — around the first of March. I knew nothing of the meeting which has been described by Mr. Davis but learned about it later. Our firm usually employs both union and non-union men and I had both union and non-union journeymen plumbers on this job. I worked along trying to get the job started when the weather permitted until March 10th, and had both union and non-union journeymen plumbers on this job. I worked along trying to get the job started when the weather permitted until March 10th, and had been receiving material for the job. On that date Mr. Atwell came out on the job in the morning — it was the second time in my life that I had seen him. He said that all union contracts had been cancelled in town and that he was opening negotiations for new contracts and wanted to know if I would negotiate a contract with him; he said that he wanted a raise in pay from $2.75 an hour to $3.75 an hour. I had been paying the men on my job $2.75 an

hour which was the prevailing union scale in Fort Smith at that time. In employing men I made no distinction between union men and non-union men. Since coming to Fort Smith I had the local newspaper carry an ad for help wanted. [A copy of the ad reads as follows: "Journeymen plumbers, $2.75 hour. Apply Daniel Plumbing and Gas Company. Eastern Metal Products job."] This ad has run more or less continuously ever since I got to town. When I get the job fully going I will need about 8 or 10 men, but right now I need only 4, considering the weather and material. When anyone answered the ad I took their names and numbers so I could contact them later, and if local competent union or non-union plumbers apply I will employ them when I can and pay prevailing wages. I pay the same wages and have the same hours and conditions as prevail for union plumbers in Fort Smith.

When Atwell came to see me and wanted a dollar an hour raise and I told him that I wasn't in a position to negotiate until I saw my father and other members of the firm, Mr. Atwell said that would bring on more talk and immediately left. At the same time Mr. Rice (union employee) walked off with him — he had worked 2 days and one hour — and in an hour and twenty minutes Rice was back carrying a picket sign, and, alternating with others, continued to do so. When I started to work I had working for me Mr. McEwing and Mr. Smith who lived in Beebe and a little later I employed Jack Rice the union plumber who lives in Fort Smith. I also had a common laborer, Mr. Weese, who lives in Fort Smith and since the picket has been up I have hired two others, and this is all the help I needed as my material was fouled up. I still have the ad running in the paper asking for applicants. Recently I haven't called anyone to work for me because I haven't needed them and I thought that others (union men) wouldn't work anyway. I also have a Mr. Hamm and a Mr. Chambers working for me and they do not live in Fort Smith. One or two men are working for me as plumbers pending an examination in Fort Smith — they have a state license. I have made no investigation to find out if applicants were union or

non-union men. I think Mr. Hamm has a union card. This is March 18th and the picket sign has been up since March 10th, and Mr. Atwell has made no overture to me and has not talked to me any further — I am willing to negotiate. I asked the employment office for some men — 2 or 3 came down (Rice was one of them and he had a union card). The employment office has not sent me any more men and won't while the picket sign is up. I have never refused to negotiate — I just had no authority to negotiate. Rice did not complain about wages.

*Harvey Hopper,* witness for Daniel. I have lived in Fort Smith 24 years — my business is plumbing and heating. The prevailing wage for journeymen plumbers is $2.75 an hour. The present contracts with Fort Smith contractors expire July 1, 1955. No one in Fort Smith pays more than $2.75 an hour which is the prevailing wage. The union is picketing no other place in Fort Smith.

*W. C. Atwell,* witness for union. I am business agent for Journeymen and Apprentices Local 29. Rice called me March 10th and said contracts had been cancelled and said he wanted me to represent him. I told Daniel all contracts had been cancelled. Daniel said "I am in no position to negotiate anything now." I turned to Rice and said "Mr. Rice what do you want to do" and he said "Well I asked you to represent me." Although I am the negotiating agent for Local 29 I have not tried to bargain with Daniel since March 10th. All contracts with Fort Smith contractors have been cancelled. I did not ask for a closed shop. The purpose of the meeting at the Chamber of Commerce was to get Fort Smith men on the job. If non-union men do work on a job the union men must get off or be subject to fining. We have cancelled no contracts in Fort Smith since March 9th, but are negotiating. None of our men get $3.75 per hour. All contracts in Fort Smith were cancelled March 9th by agreement. We couldn't have cancelled the contracts before July 1, 1955, except by agreement. We are not picketing any one else in Fort Smith. "Q. And now you mean to say that everybody in town

that has a union contract has agreed for it to be cancelled? A. Yes, sir." "We have contracts with Lutz Bros., L. D. Burris, Hayes Bros., G. O. Bell, John Rupp, Ralph O'Brien and George H. Donnas." "Q. By this cancellation you are talking about, that is all have been by agreement with these other fellows, so you said?" "A. Yes sir—We are not picketing any one else in Fort Smith."

After the temporary order was issued the following testimony was later introduced.

*Lester Burgess,* for appellants, lives in Oklahoma—employed with Burris Heating and Plumbing Company. I am President of Union 29. Our union men take a secret oath which I am unable to recall. When the union needs men they call the "hiring hall" and Mr. Atwell and he sends out the men. He does not send out non-union men. There are no non-union men up there. Members of the union support the "hiring hall." "Q. Therefore you are not interested in getting non-union plumbers any work? A. We are not interested because they do not belong to our organization." The purpose of the picket line is usually a protest against some condition or wage. We picketed in this instance because we felt that Daniel was discriminating against our members because he wasn't hiring the men we sent to him. The purpose of the picket line was to try to get some of our men to work. "Q. In other words, you are saying, in a round about way, that the purpose of it was to shut the job down, isn't it? A. Well it worked that way, I suppose, Yes." Daniel was bringing men in from over the state but didn't hire our men. All Fort Smith contracts were cancelled by mutual agreement. "Q. You mean to say that you contacted each of these union contractors and he agreed that his contract would be cancelled? A. Yes, sir. Q. Do you remember who they were? A. Well I believe that it was Burris Heating and Plumbing Co., Herb Andrews Plumbing Co., Hayes Bros., and Joe Bender." I know that contracts were cancelled with Lutz, Burris, Hayes Bros., Bell, Rupp, O'Brien and George

Donnas. Atwell was authorized to send out the letter of March 9th cancelling the contracts.

*G. O. Bell* — Lived in Fort Smith since 1922, 64 years old, is in the plumbing business and has been for 24 years, operates G. O. Bell Plumbing Co. — known as "union contractor" and has a contract with Local 29. I have been an officer in the union, president and on the board 30 years ago. I don't remember ever getting a letter from Mr. Atwell attempting to cancel contract (after looking at the letter) this is the first I have heard about it. I have had no notice of cancellation. "Q. State whether or not by mutual agreement with Mr. Atwell, or the union, you agreed to the cancellation of the contract? I haven't talked to the man in a year — I have had no conversation with Atwell or the union about negotiating a new contract."

*Fred Lutz,* member of Lutz Bros. Plumbing Co. I have been in business 10 years in Fort Smith — 50 years old — am a union contractor — contract with Local Union. I received the letter in question. "Q. Is that the first notice you had that it was cancelled? A. The first notice that it was cancelled, yes sir. Q. Since that have you had any negotiations with reference to a new contract with Mr. Atwell or any member of the union? A. Not so far."

*John Thurman,* president of Daniel Plumbing Co. I told Mr. Daniel to tell Mr. Atwell that if he wanted to negotiate to drop me a line and I would meet with him at any convenient time and be glad to talk with him.

*W. C. Atwell,* recalled. Since the temporary injunction I asked Merl Daniel if he would sit down and talk to us, he said he would let me know as soon as he got in touch with Mr. Thurman. I have never heard from him, he was in Florida.

After careful consideration of the record and also the arguments and citations presented by both sides we have concluded that this case presents to us a factual situation only. Stated another way, the question for con-

sideration relates to the weight and sufficiency of the evidence to support the Chancellor's finding. So considered, it is our further conclusion that the decision of the trial court is not against the weight of the evidence and that it must therefore be affirmed.

For clarity and convenience we classify appellants' alleged excuses or reasons for picketing appellee's place of operation as follows: (a) To secure work for Fort Smith labor both union and non-union; (b) To secure higher wages for Rice and perhaps other union employees of appellee; (c) Because appellee refused to employ union men, and; (d) Because appellee refused to negotiate.

It is our opinion that the weight of the testimony accords with the Chancellor's finding that appellants' alleged excuses or reasons for picketing were not sustained or that they were non-existent.

(a) It was not a permissible objective for Local 29 to picket in order to force appellee to employ Fort Smith labor (including non-union labor) in preference to labor from other sections of the state. Such objective would tend to retard rather than promote the welfare of the union. In the case of *Hughes, et al.* v. *Superior Court of California*, 339 U. S. 460, 70 S. Ct. 718, 94 L. Ed. 985, it was held unlawful to peacefully picket the owner of a store to force him to hire negro employees in proportion to their patronage. The reasoning employed there is, we think, applicable here. Moreover appellants' witnesses admitted that the union was not interested in securing jobs for any one except its own members.

(b) We are not convinced by the testimony that the real purpose of the picketing was to secure higher wages for Rice. Rice was already receiving the prevailing union wages and had not expressed any dissatisfaction to appellee. All other union employees in Fort Smith were working for the same wage scale, although no other job was being picketed and although (as the testimony shows) the union was not negotiating for higher wages with at least some of the union contractors. In fact it was not shown by any union contractor that it was negotiating

with appellant union. Statements were made that the union was negotiating with all Fort Smith contractors, but these uncorroborated statements were contradicted by two of the named contractors.

(c) We think the testimony justified the Chancellor's finding that appellee did not discriminate against union laborers. When the picket was established on March 10th, appellee was just getting the job under way and needed, at that time, very few employees and particularly plumbers. It is not clear from the record just how many employees appellee had on the job at the stated time, but it does appear that they were divided fairly equal between union and non-union men. It is clear that appellee was employing two union men. It was stated that appellee did not call for any union men after March 10th, and that those who did apply for work were refused. In the first place the testimony does not disclose any specific instance where any union man so applied. Appellee admits it has not asked the (union controlled) "hiring hall" for any union workers since March 10th, but, as is clearly evident, it would have been a futile gesture. Not being able to know what Merl Daniel's future plans were, it is possible that had the union waited a few days it might have been able to show discrimination but, in our opinion, none was shown to exist at the time the picket line was established.

(d) Likewise, we think, the testimony supports the finding that appellee did not refuse to arbitrate. Not only was it made clear that Merl Daniel had no authority to arbitrate, but he was given no reasonable chance to do so. It is not contended by appellants that Merl Daniel said he would not negotiate or that he was unwilling to do so. This was merely a hasty conclusion which Atwell drew and hastily acted upon. This conclusion, we think, was unjustified. It would not be justified in ordinary business relations and we know of no special reason why it should be here.

The remaining question is: Does the evidence sustain the Chancellor's conclusion that Local 29 was picketing

for a closed shop in violation of Amendment 34 of the Arkansas Constitution? We think it does.

It must be assumed that the able and experienced representatives of the union had some definite objective in establishing the picket line, otherwise their actions must be considered senseless. If, therefore, appellants were unable to establish any other reason for picketing in this instance, then it is not unreasonable to deduce that the real purpose was to obtain a closed shop. Portions of the testimony lend support to this deduction.

It is not disputed that Atwell stated, approximately a week before appellee's job actually began, that it would be closed down for 90 days. The incident at the Chamber of Commerce Hall is some indication that the union was planning to exert some kind of pressure or influence in behalf of its members. One union officer stated union members took a secret oath, the violation of which could subject them to penalties. Appellee made an unsuccessful effort to obtain the contents of this oath. Appellants' testimony was evasive and unsatisfactory concerning when and how contracts with Fort Smith contractors had been cancelled. Appellee's testimony in that connection raises a suspicion that appellants' whole contention in this regard may have been a subterfuge to justify the action they took. The testimony of appellant's witness, Burgess, may have significance relative to the real objective of the picket line. At least the Chancellor had a right to so consider it in connection with all the other facts and circumstances.

"Q. Does your constitution and rules discipline a union man who works with a non-union man.

A. Quite possibly does.

Q. Well I believe you also stated that the other main purpose was to obtain union labor throughout?

A. Well that kindly follows along with it.

Q. The whole idea of your union and your reason for existence is to obtain contracts where only union people will be employed, isn't it?

A. That is true but you will find in there a statement that any violation of state law cancels any portion of that.

Q. But your principal objective is to use every means you can to have the employers employ your members isn't it?

A. Well certainly.

Q. No others.

A. (No answer)''

Appellants stoutly maintained throughout that they were not picketing for a closed union shop, but this entire record is a reminder of the old adage that offtimes actions speak louder than words.

Without relying entirely or especially on any one fact or circumstance mentioned above, it is our opinion that the record as a whole justifies the Chancellor's decision that Local No. 29 established the picket line in question to force appellee to employ only union men, contrary to Amendment 34 of the Arkansas Constitution.

Affirmed.

Justices GEORGE ROSE SMITH and ROBINSON dissent.

SAM ROBINSON, J., dissenting. There is only one issue and that is whether the plumbers were picketing for the purpose of coercing Daniel into making a contract for a ''closed shop'' in violation of Amendment No. 34 to the Constitution of this State prohibiting discrimination for or against union labor. It is the contention of Daniel that the union was seeking a contract for a closed shop whereby Daniel would employ union labor only. There is an abundance of evidence to the effect that the union did not want to be discriminated against, but there is absolutely no evidence showing that the union wanted to bring about a violation of the constitutional amendment. The majority have not pointed out any substantial evidence to that effect and to say that the union men were seeking a closed shop is pure speculation.

It is conceded by all that picketing is unlawful in this State if it is for the purpose of forcing a closed shop; but the point here is that the evidence does not justify a conclusion that the union men were seeking an unlawful contract. It is practically undisputed that the union men felt that they were being discriminated against; they had a right to peacefully picket and thereby give publicity to such discrimination. *Thornhill* v. *Alabama,* 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093. The picket sign put up by the union read: "E. B. Daniel Plumbing & Butane Company is discriminating against organized labor and Local No. 29 Plumbers and Steam Fitters."

Daniel had a good-sized job; ten or twelve journeymen plumbers would be needed. There does not appear to have been a shortage of qualified plumbers in the city of Fort Smith. The union plumbers of that city, anticipating that Daniel would avoid giving them employment, brought about a meeting of members of the Chamber of Commerce and the contractor, Davis, in an effort to get work for the local men. Certainly these men were acting within their rights in trying to obtain employment. Daniel was running an ad daily in the local paper seeking to employ plumbers; the local union employment office which could have furnished the needed men was not contacted and only one union plumber was employed. Daniel caused about twelve applicants to take the examination for a plumber's license in Fort Smith, all of whom failed to pass the examination except Merl Daniel; he took the examination and passed it; there is absolutely no evidence that the examination was unfair or that the men who took it and failed were in fact qualified plumbers. The fact that Daniel was having these unqualified men take the examination, when local licensed union plumbers were available and wanted work, shows rather conclusively that Daniel was discriminating against the union members, especially so when Daniel continued to run the ad for plumbers. The evidence is convincing that Daniel did not want to employ union men and was doing everything possible to avoid it. Of course, the members of the

union wanted employment and, in an effort to obtain work, they attempted to bring economic pressure on Daniel by establishing a picket line to prevent discrimination against the union. This State has no law from any source which prohibits peaceful picketing in a situation such as is presented here.

The majority appear to stress the point that at the time of commencement of the picketing only one union man was employed by Daniel. The picketing would have been lawful if no union men had been in the employ of Daniel. *Senn* v. *Tile Layers Union,* 301 U. S. 468, 57 S. Ct. 857, 81 L. Ed. 1229; *Cafeteria Union* v. *Angelos,* 320 U. S. 392, 64 S. Ct. 126, 88 L. Ed. 58; *A. F. of L.* v. *Swing,* 312 U. S. 321, 61 S. Ct. 568, 85 L. Ed. 855.

I am thoroughly convinced from the record in this case that the union men were not picketing for the purpose of coercing Daniel into entering into a contract for a closed shop in violation of the law of this State, but were picketing for the purpose of preventing discrimination against the union men.

Therefore, I respectfully dissent.

Mr. Justice GEORGE ROSE SMITH joins in this dissent.