**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED MINE WORKERS OF AMERICA, United Mine Workers of America, District 2, and United Mine Workers of America, Local 6796, Respondents.**

No. 18056.

United States Court of Appeals, Third Circuit.

Argued Feb. 19, 1970.

Decided July 13, 1970.

142

Douglas Leslie, Atty., N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., on the brief) for petitioner.

Francis J. Leahey, Jr., Englehart, Creany, Englehart & Leahey, Ebensburg, Pa. (Eugene A. Creaney, Ebensburg, Pa., on the brief) for respondents.

Before KALODNER and VAN DU-SEN, Circuit Judges, and FULLAM, District Judge.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

The National Labor Relations Board ("Board"), pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), seeks enforcement of its November 8, 1968, Order [1] issued against respondents United Mine Workers of America ("UMW"), United Mine Workers of America, District 2 ("District 2"), and United Mine Workers of America, Local 6796 ("Local 6796").[2] The Board found that respondents UMW, District 2 and Local 6796 had violated Section 8(b) (1) (A) of the Act, 29 U.S.C. § 158(b) (1) (A), by restraining and coercing with acts and threats of violence, members of the Southern Labor Union ("SLU") in Home, Pennsylvania, on December 17, 1967. The Board further found that respondents UMW and District 2 had violated Section 8(b) (1) (A) of the Act by restraining and coercing with acts and threats of violence, employees of the Mears Coal Company at its plant in Dixonville, Pennsylvania, on January 30, 1968.

The facts critical to our disposition are as follows:

The area membership of the SLU is comprised of seven local unions which have collective bargaining agreements with the Mears Coal Company, and six other area coal companies.[3] SLU called a membership meeting for Sunday, December 17, 1967, at the Consolidated School building in Home, Pennsylvania. On that day, respondent Local 6796 held a Christmas party in Clymer, Pennsylvania. Yackuboskey, a member of Local 6796, later testified at the Board hearing [4] that Simpson, president of Local 6796, made a motion during the course of the party to go to the Consolidated School "to talk to men who were non-members of the SLU * * *." The motion was seconded and approved, and Yackuboskey estimated that "around 30 and maybe a few more than that" of the members then left for the school.

When Plavi, vice president of SLU Local 253, arrived at the Consolidated School just prior to the meeting to ready the building, he observed, "around 100 cars, and between approximately 400 and 500 United Mine Workers" collected about the school grounds. Plavi entered the school, but soon became apprehensive and left to contact another SLU official. While at the school, Plavi recognized Simpson and Yackuboskey among the men gathered. As he was leaving Kanapic, whom Plavi understood to be a UMW Local president, told him, "Joe, you better not have this meeting." [5] When Plavi replied that he intended to hold the meeting, someone in the group responded, "God-damned if you will."

Following Plavi's departure, other members of the SLU began to arrive,

1. 173 N.L.R.B. No. 100 (1968).

2. The parties have stipulated that, for the purposes of this proceeding, respondents UMW and District 2 are to be considered as one and the same party; the actions and duties of each will be attributed to the other.

3. Penn Hill Coal Corp., MY Coal Co., Peles Bros. Coal Co., Copper Valley Coal Co., Chestnut Ridge Mining Co., and Dixon Run Coal Co.

4. The Regional Director ordered that a hearing be held on May 14, 1968, to consider the charges filed by the SLU and the Mears Coal Company against respondents. The Trial Examiner issued a Decision on August 30, 1968. Respondents filed Exceptions to Trial Examiner's Decision on September 23, 1968, and the Board issued its Decision and Order adopting the Trial Examiner's Decision on November 8, 1968.

5. At the hearing before the Trial Examiner, Plavi testified that he "assumed" Kanapic was the president of a UMW Local because he acted as spokesman. Respondents introduced no evidence as to Kanapic's status.

among them Rice, president of SLU Local 245. While Rice waited in his automobile for Plavi to open the school door, he was approached by two men whom he recognized as District 2 organizers. They told him that the UMW was going to be the only union in the area.

When Plavi returned to the school a short time later, some 20 SLU members had arrived. Plavi left his automobile, taking with him a tape recorder, and ascended the steps leading to the school entrance. As he did so, Simpson shouted, "We will run you back to Tennessee with the rest of the bunch." Several UMW members standing at the foot of the steps said, "Don't let them go in;" then, "Oh, let them go in they aren't going to have a meeting anyhow." Others in the crowd shouted "scab." Plavi unlocked the school door, and eight or nine SLU members entered. Plavi, however, remained at the top of the steps with the tape recorder, and said, "If anyone here wants to make a statement, I have a tape recorder here. I will be glad to take your statement."

Present at this time were DeGretto, an international representative of the UMW and director of organization of District 2, Telk, a representative of District 2, and Simpson.[6] DeGretto stood several steps below Plavi on the stairway.

Some 12 or more men began crowding and "pawing" Plavi, and one unplugged the tape recorder. Two men then seized Plavi and held him while a third struck him violently on the back of his head, knocking him to the ground. No one attempted to prevent or discourage the assault, nor was any effort made to disperse the crowd at that time. Following the assault, the man who struck Plavi said to the SLU members who remained inside the school, "There is your follower. Does anybody want to step out and take it?"

When Plavi was able to stand, he told the SLU members to leave, and that no meeting would be held. Thereupon, Plavi and the other members of the SLU left the school. Plavi was hospitalized for a total of 16 days as a result of the assault.

The events surrounding the January 30, 1968, Mears Coal Company incident are substantially the following. The Mears Company operates a coal processing plant in Dixonville, Pennsylvania. Trucks delivering coal to it must travel on State Route 223 to its intersection with Township Road. The Mears Company scale house, used in weighing the incoming coal, is located on Township Road, about 100 feet from its intersection with Route 223. On Route 223, about 150 feet from the intersection, is an abandoned office building, which had been damaged two weeks before by a dynamite explosion.

Mears Company management had received warnings from the State Police to expect "an accumulation" of men around the Mears Company plant on January 29 or 30. Shortly after 8 a. m. on January 30, a crowd of between 75 and 100 men gathered at the intersection of Route 223 and Township Road, and then advanced along Township Road, effectively blocking it. Among the crowd was Telk, a representative and agent of respondent District 2. Those in the crowd shouted: "You sons-of-bitches brought the Southern Labor Union in and we are going to send them back to Tennessee;" "We will blow the place off the map;" and "You will either become United Mine Workers or we will get even." Some of the crowd eventually entered upon Mears Company property, and approximately 25 of its number "surrounded" the scale house.

Charles Mears and Earl Bence, partners in the Mears Company, approached the crowd, and Mears asked to talk with a spokesman. The crowd selected Telk,

6. The parties stipulated before the Trial Examiner that DeGretto was to be considered the agent of respondents UMW and District 2, and that Telk was the agent of respondent District 2. It was further stipulated that Simpson was to be considered the agent of respondent Local 6796.

and Mears, Bence, Telk and two other men whom Telk introduced as UMW Local presidents, went into the scale house.

Mears began by asking what the men wanted, to which Telk replied by questioning what Mears was going to do about the SLU. When Mears explained that his company had a contract with the SLU, Telk said, "You hear those men out there hollering. This is not going to satisfy them. They want you to get rid of the Southern Labor Union." Demanding that the Mears Company become "members" of the UMW, Telk added: "These men are old style coal miners." One of the UMW Local presidents stated that they would resort to any means to send the SLU back to Tennessee, and that: "You are not going to shut down temporarily, you are going to shut down permanently until you become a member of the United Mine Workers." Two employees of the Mears Company were in the small scale house at this time and presumably could overhear the conversation.

The discussion ended, and as the men left the scale house, someone noticed a rifle in the back seat of Mears' automobile, which was parked in front of the scale house. Some of the crowd rocked the car and tried to pry open its doors. A sheriff who was present dispersed them. Someone then called attention to the armed guards maintained by the Mears Company since January 17, 1968, when its old office building was dynamited. Some in the crowd shouted that they would get guns and come back to fight. Telk then ordered the men to leave and they complied. Mears directed the approximately 15 employees at the plant to leave the property, which they did. Mears also notified suppliers of coal to the Company not to attempt deliveries that day.

When Bence, Mears' partner, returned to their plant less than two hours later, he observed approximately 400 men standing on both sides of Route 223, as well as approximately 50 to 75 people standing on Township Road, again blocking it. Bence's progress along Route 223 was impeded by the crowd. As he drove past the plant, he noticed some of the crowd setting fire to the dynamited office building.

Section 8(b) (1) (A) of the Act, upon which the Board relies, provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7. * * *"

In material part, Section 7 of the Act states:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection, and shall also have the right to refrain from any or all such activities. * * *"

The record affords ample evidence that all three respondents had violated Section 8(b) (1) (A) with respect to the SLU meeting scheduled for December 17, 1967, and that respondents UMW and District 2 had further acted in violation of the Act with respect to the mass picketing and other incidents at the Mears Company on January 30, 1968. We find without merit the contentions advanced by respondents to justify their earlier detailed conduct.

Regarding the SLU meeting planned for December 17, respondents assert that the single reason the meeting was not held was "the irresponsible actions of Plavi, which obviously incited a few members of the assemblage to physical action," and that, in any event, respondents cannot be held responsible for the "isolated and minor incident" [7] occa-

7. Concerning a similar contention that the incident in issue was too "isolated" and "trivial" to warrant Board sanction, see N.L.R.B. v. Local 140, United Furniture

sioned by the individual acts of the crowd gathered at the Consolidated School.

█ It is clear, as the Board found, that Plavi's language and acts were not such as would reasonably "incite" a crowd to commit violence. The statement of Plavi's assailant immediately after the assault, evidences that the attack on Plavi was in manifestation of the crowd's hostility, intimidation and harassment. Far from being "isolated," the assault was central to the crowd's avowed intention of preventing the SLU meeting from taking place. Such threats, intimidation, and physical abuse are in clear violation of Section 8(b) (1) (A). *See*, N.L.R.B. v. Taxicab Drivers Union, Local 777, 340 F.2d 905, 909 (7 Cir.1964); N.L.R.B. v. Dressmakers Joint Council, International Ladies' Garment Workers Union, AFL–CIO, 342 F.2d 988 (2 Cir.1965), *enforcing* 146 N.L.R.B. 559 (1964).

█ As the Board found, the massing of large numbers of men outside the SLU meeting place was itself violative of Section 8(b) (1) (A) strictures. It is well settled that picketing which interferes with or blocks the ingress and egress of employees and others at a place of employment, or which, in effect, forces employees to "run a gauntlet," is inherently coercive and in contravention of the Act. *See*, American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 205–207, 42 S.Ct. 72, 66 L.Ed. 189 (1921); Hughes v. Superior Court of California for Contra Costa County, 339 U.S. 460, 466, 70 S.Ct. 718, 94 L.Ed. 985 (1950). *Cf.*, N.L.R.B. v.

United Mine Workers of America, 195 F.2d 961, 962 (6 Cir.1952), cert. denied, 344 U.S. 920, 73 S.Ct. 387, 97 L.Ed. 709, (1953); United Mine Workers of America Local 7083 (Grundy Mining Company), 164 N.L.R.B. 176 (1964). It need not be shown that the massing of pickets in fact achieved its intended result in order to establish a violation of Section 8(b) (1) (A). This Court has specifically held in Local 542, International Union of Operating Engineers, AFL–CIO v. N.L.R.B., 3 Cir., 328 F.2d 850, 852–853, cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964):

"The test of coercion and intimidation is not whether the misconduct proves effective. The test is whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act. Highway Truck Drivers & Helpers Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 107 U.S. App.D.C. 1, 273 F.2d 815 (1959); Time-O-Matic, Inc. v. N.L.R.B., 264 F.2d 96, 99 (7th Cir.1959); Progressive Mine Workers of America, International Union v. N.L.R.B., 187 F.2d 298, 301 (7th Cir.1951); N.L.R.B. v. Ford, 170 F.2d 735, 738 (6th Cir. 1948). * * *"

█ Considerations underlying the prohibition against picketing which interferes with employee travel to and from work applies with equal force and validity to the massing of large numbers of hostile men around an employee meet-

---

Workers of America, CIO, 233 F.2d 539 (2 Cir. 1956), wherein Judge Medina said:

"As far as we can discern the only reason advanced for a refusal to enforce the order with respect to the picketing is that it was an isolated incident, too trivial for notice by the Board or by us. But it was well planned and executed with all the precision of a military operation, and the illegal procedure adopted was so completely successful that attempts to do the same thing again were quite unneces-

sary. It would be a sorry state of affairs if such improper conduct should be condoned and encouraged by a ruling that only unsuccessful and repeated mass picketing, attended by physical exclusion of employees from their place of work, should be considered sufficiently substantial to warrant an adjudication that a union had restrained and coerced the employees in the exercise of their right not to join a union, guaranteed them in Section 7 of the Act, in violation of Section 8(b) (1) (A) thereof."

ing place. Rights secured by Section 7 of the Act, in both instances, are invaded by acts and threats condemned in express terms by Section 8(b) (1) (A). The happenstance of the situs of the illegal conduct is not controlling.

Respondents' responsibility for these acts and threats of violence stems from both the direct participation of respondent's agents in the unlawful activity, and the failure of those agents to discourage, prevent, or repudiate the unlawful conduct of the UMW membership. Substantial evidence supports the Board's finding that respondent Local 6796 travelled to the Consolidated School as a unit, and at the instigation of Simpson, its president. It is uncontradicted that Simpson actively participated in restraining and coercing the SLU membership in the exercise of their Section 7 rights. Counsel for respondents urges, by way of defense, that Local 6796 went to the SLU meeting merely "to talk to men who were non-members of the SLU * * *." The conduct of respondent Local 6796 while at the Consolidated School negatives the asserted "intention."

Additionally, both DeGretto, an international representative of respondent UMW and a director of respondent District 2, and Telk, a representative of respondent District 2, were present at the Consolidated School when the activity at issue took place. It is undisputed that neither DeGretto nor Telk made any real attempt to disperse the crowd, or to still the shouts and threats until after the assault on Plavi. No assistance was offered Plavi during or following his brutal beating.

■ It is not necessary that the Board find that respondents, through their agents, specifically intended to coerce or intimidate the SLU membership, since respondents "must be presumed to have intended the natural and reasonably foreseeable consequences of their acts." N.L.R.B. v. Local 140, United Furniture Workers of America, CIO, 233 F.2d 539, 541 (2 Cir.1956). Respondents' unexplained inaction in the

face of the intemperate and highly reprehensible misconduct of the mass gathering, amply sustains the Board's finding as to their liability.

■ The evidence before us amply supports the finding of the Board that respondents UMW and District 2 were also responsible for the events of January 30, 1968, at the Mears Company plant. Significant here is that State Police, some days in advance, were able to warn the Mears Company to expect a mass gathering on January 29 or 30, and that Telk was notified by a judge of the Indiana County, Pennsylvania, Court of Common Pleas that he would hold Telk responsible "if anything goes on" regarding an impending mass picketing in the Clymer area. It is apparent that the massing of pickets on January 30th was a prearranged and coordinated effort. In addition, Telk and two UMW Local presidents served as spokesmen for the crowd, and their conversation with a Mears Company officer, echoed the crowd's shouted coercive and intimidating threats. Finally, no action was taken to disperse or discourage the crowd, or to repudiate their conduct in any way, until after Mears' automobile was rocked, and the crowd threatened to return with guns. Under such circumstances, respondents must be held directly accountable for the misconduct of the crowd. See, N.L.R.B. v. United Mine Workers, District 31, 190 F.2d 251, 252 (4 Cir.1951). The repeated threats made by UMW members and agents alike to the Mears Company management were in blatant violation of Section 8(b) (1) (A).

■ Nor does respondents' culpability end here. It is well established that "[d]estruction of the employer's property restrains the employees in the exercise of their rights under Section 7 by threatening their jobs and by creating a general atmosphere of fear and violence." New Power Wire and Electric Corp. v. N.L.R.B., 340 F.2d 71, 72 (2 Cir.1965). Moreover, the destructive acts need not be done in the actual presence of employees since they will ulti-

mately learn of them. N.L.R.B. v. Local 140, United Furniture Workers of America, CIO, *supra*, 233 F.2d 541. The burning of the dynamited Mears Company office building was plainly action taken in consonance with the earlier made threats against the Company for employing SLU members. We concur in the Board's finding that respondents UMW and District 2 are liable for this illegal conduct.

For the reasons stated, the Order of the Board will be enforced. A Decree may be submitted.